COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| TEXAS CUSTOM POOLS, INC., | § | |
| FORMERLY KNOWN AS | | No. 08-07-00197-CV |
| RIVERBEND POOLS, INC., | § | |
| | | Appeal from the |
| Appellant, | § | |
| | | 393rd District Court |
| v. | § | |
| | | of Denton County, Texas |
| | § | |
| ALLAN CLAYTON and | | (TC# 2000-60215-393) |
| MIRIAM CLAYTON, | § | |
| | | |
| Appellees. | § | |

**OPINION ON MOTION**

Pending before the court is a motion filed by Appellant, Texas Custom Pools, Inc., formerly

known as Riverbend Pools, Inc.(TCP), to review the trial court's order setting aside TCP's

certificate of cash in lieu of supersedeas bond and granting post-judgment injunctive relief. *See*

TEX.R.APP.P. 24.4.  We grant the motion.

**FACTUAL AND PROCEDURAL SUMMARY**

Allan and Miriam Clayton filed suit against TCP in 2000.  Following a jury trial, the trial

court entered judgment against TCP for $1,269,829.  TCP filed notice of appeal to the Fifth Court

of Appeals.[1]  It deposited $125 with the Denton County District Clerk and filed a Certificate of Cash

in Lieu of Supersedeas Bond, supported by the Affidavit of Alfred E. Mondoux, Chief Financial

Officer of TCP.  According to Mondoux's affidavit, TCP had a negative net worth of $165,182.  The

Claytons filed a motion contesting TCP's net worth and seeking injunctive relief.  The trial court

conducted a two-day hearing on the Claytons' contest and considered a substantial amount of

evidence, both testimonial and documentary.

The trial court resolved the issues presented with the following order:

(1)  The Court finds that Defendant Texas Custom Pools, Inc. is not insolvent;

(2)  The Court finds that the net worth of Defendant Texas Custom Pools, Inc. on
June 27, 2007 was Eight Million, Six Hundred Eighty-One Thousand, Six Hundred
Fifty-Nine Dollars and 87/100 ($8,681,659.87) as the following deductions from net
worth claimed by Texas Custom Pools, Inc. are improper and must be added back
into the net worth of negative ($165,182.00) as claimed in the June 27, 2007
Affidavit of Alfred E. Mondoux:

> (a) $234,668.92 deducted out in Note 6 in the Balance Sheet attached
> as Exhibit 'B' to the Affidavit of Alfred E. Mondoux;
>
> (b) $43,526.01 deducted out in Note 6 to the Balance Sheet attached
> as Exhibit 'B' to the Affidavit of Alfred E. Mondoux;
>
> (c)  The following deductions totaling $8,846,841.87 paid to the
> owners of Texas Custom Pools, Inc. from 1999 through 2007;
>
> > 1.  1999: $1,980,320.00
> > 2.  2000: $2,376,384.00
> > 3.  2001: $382,500.00
> > 4.  2002: $789,100.00
> > 5.  2003: $780,000.00
> > 6.  2004: $0.00
> > 7.  2005: $522,578.00
> > 8.  2006: $715,959.87

---

[1]  The Texas Supreme Court entered a docket equalization order transferring the appeal from the Fifth Court
of Appeals to the Eighth Court of Appeals.  *See* TEX.GOV'T CODE ANN. § 73.001 (Vernon 2005).  We are unaware of
any conflict between precedent of the Fifth Court of Appeals and that of this Court on any relevant issue.  *See*
TEX.R.APP.P. 41.3.

9. 2007: $1,300,000.00

(3) The Court finds that the net worth of Defendant Texas Custom Pools, Inc. is now Eight Million, Six Hundred Eighty-One Thousand, Six Hundred Fifty-Nine Dollars and 87/100 ($8,681,659.87);

(4) The Court finds that the Affidavit of Defendant Texas Custom Pools, Inc.'s Chief Financial Officer Alfred E. Mondoux is false; and

(5) The Court finds that one-half of the net worth of Defendant Texas Custom Pools, Inc. is Four Million, Three Hundred Forty Thousand, Eight Hundred Twenty-Nine Dollars and 94/100 ($4,340,829.94).

It is further ORDERED, ADJUDGED AND DECREED that the Certificate of Cash in Lieu of Supersedeas Bond previously filed by Defendant Texas Custom Pools, Inc. is hereby set aside.

It is further ORDERED, ADJUDGED and DECREED that Defendant Texas Custom Pools, Inc. is hereby enjoined from dissipating or transferring assets to avoid satisfaction of the Judgment held by Plaintiffs, including the payment of any bonus or repayments of any debts to or on behalf of Charles Barnes, Travis Bain or any other shareholder or owner of Texas Custom Pools, Inc.

TCP filed a petition for writ of mandamus seeking review of the trial court's order, but alternatively requesting that we consider the petition as a motion filed pursuant to TEX.R.APP.P. 24.4. We have elected to treat it as a Rule 24.4 motion.

## NET WORTH DETERMINATION

In its motion, TCP contends that the trial court abused its discretion in finding that TCP's net worth was $8,681,659.87 when the evidence conclusively established that it had a negative net worth. The Claytons respond that TCP's motion should be denied and the stay order lifted because the trial court's net worth determination is supported by legally and factually sufficient evidence. Alternatively, the Claytons maintain that TCP's net worth is either $6,701,339.87 or $2,104,902.44.

### Applicable Law

Under Rule 24.1 of the Rules of Appellate Procedure, a judgment debtor may supersede a

judgment by (1) filing with the trial court clerk a written agreement with the judgment creditor for suspending enforcement of the judgment; (2) filing with the trial court clerk a good and sufficient bond; (3) by making a deposit with the trial court clerk in lieu of a bond; or (4) providing alternate security ordered by the trial court. When the judgment is for money, the amount of the bond, deposit, or security must equal the sum of compensatory damages awarded in the judgment, interest for the estimated duration of the appeal, and costs awarded in the judgment. TEX.R.APP.P. 24.2(a)(1); TEX.CIV.PRAC.&REM.CODE ANN. § 52.006(a)(Vernon 2008). However, the amount must not exceed the lesser of 50 percent of the judgment debtor's current net worth or 25 million dollars. TEX.R.APP.P. 24.2(a)(1); TEX.CIV.PRAC.&REM.CODE ANN. § 52.006(b).

Rule 24.2(c) sets forth the procedure for determining net worth. A judgment debtor who provides a bond, deposit, or security under Rule 24.2(a)(1)(A) in an amount based on the debtor's net worth must simultaneously file an affidavit that states the debtor's net worth and states complete, detailed information concerning the debtor's asset and liabilities from which net worth can be ascertained. TEX.R.APP.P. 24.2(c)(1). The affidavit is *prima facie* evidence of the debtor's net worth. *Id.* A judgment creditor may file a contest to the debtor's affidavit of net worth. TEX.R.APP.P. 24.2(c)(2). Net worth is calculated as the difference between total assets and total liabilities as determined by generally accepted accounting principles (GAAP). *G.M. Houser, Inc. v. Rodgers*, 204 S.W.3d 836, 840 (Tex.App.--Dallas 2006, no pet.); *Ramco Oil & Gas, Ltd. v. Anglo Dutch (Tenge) L.L.C.*, 171 S.W.3d 905, 915 (Tex.App.--Houston [14th Dist.] 2005, no pet.). At the hearing on the judgment creditor's contest, the judgment debtor has the burden of proving net worth. TEX.R.APP.P. 24.2(c)(3). The trial court is required to issue an order that states the debtor's net worth and states with particularity the factual basis for that determination. *Id.* The trial court is also authorized to enjoin the judgment debtor from dissipating or transferring assets to avoid satisfaction

of the judgment. TEX.R.APP.P. 24.2(d). On the motion of a party, an appellate court may review the sufficiency or excessiveness of the amount of security. TEX.R.APP.P. 24.4(a); TEX.CIV.PRAC. &REM.CODE ANN. § 52.006(d); *G.M. Houser*, 204 S.W.3d at 840.

*Standard of Review*

We review the trial court's determination of the amount of security for an abuse of discretion. *G.M. Houser*, 204 S.W.3d at 840. If we conclude the trial court abused its discretion, we may order the amount of the security increased or decreased in an amount not to exceed the lesser of 50 percent of the judgment debtor's net worth or $25 million. TEX.R.APP.P. 24.4(a); TEX.CIV.PRAC.& REM.CODE ANN. § 52.006(d).

In conducting this review, we engage in a two-pronged analysis: (1) Did the trial court have sufficient information upon which to exercise its discretion; and (2) Did the trial court err in its application of discretion? *Leibman v. Grand*, 981 S.W.2d 426, 429 (Tex.App.--El Paso 1998, no pet.). The traditional standards utilized to review sufficiency of the evidence come into play when considering the first question. *Id.* at 429-30. We then proceed to determine whether, based on the elicited evidence, the trial court made a reasonable decision, or whether it is arbitrary and unreasonable. *Id*. at 430. The question is not whether, in the opinion of the reviewing court, the facts present an appropriate case for the trial court's action, but whether the court acted without reference to any guiding rules and principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 242 (Tex. 1985). The mere fact that a trial judge may decide a matter within her discretionary authority in a different manner than an appellate judge in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *Leibman*, 981 S.W.2d at 430.

TCP challenges the legal and factual sufficiency of the evidence supporting the trial court's determination that its net worth is $8,681,659.87. Because TCP had the burden to prove net worth,

it must show the evidence conclusively establishes, as a matter of law, all vital facts in support of their position. *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989); *G.M. Houser*, 204 S.W.3d at 840-41. In reviewing a "matter of law" challenge, the reviewing court must first examine the record for evidence that supports the finding, while ignoring all evidence to the contrary. *Sterner*, 767 S.W.2d at 690. If there is no evidence to support the finding, the reviewing court will then examine the entire record to determine if the contrary proposition is established as a matter of law. *Sterner*, 767 S.W.2d at 690. In conducting our review, we must consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *G.M. Houser*, 204 S.W.3d at 841, *citing City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We must credit favorable evidence if a reasonable fact finder could and disregard contrary evidence unless a reasonable fact finder could not. *Id.*, *citing City of Keller*, 168 S.W.3d at 827; *Ramco*, 171 S.W.3d at 910. Finally, we must determine whether the evidence before the trial court would enable reasonable and fair-minded people to find the facts at issue. *Id.* We also bear in mind that the fact finder is the sole judge of the credibility of the witnesses and the weight to give their testimony. *Id.*

In reviewing the factual sufficiency of the evidence, we consider all of the evidence in the record. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996). If a party is attacking the factual sufficiency of an issue upon which it had the burden of proof, it must demonstrate that the adverse finding is against the great weight and preponderance of the evidence. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983); *Marrs and Smith Partnership v. D.K. Boyd Oil and Gas Co., Inc.*, 223 S.W.3d 1, 14 (Tex.App.--El Paso 2005, pet. denied). In reviewing a factual sufficiency issue, we must first examine the record to determine if there is some evidence to support the finding; if so, then we must determine whether the failure to find is so contrary to the overwhelming weight and

preponderance of the evidence as to be clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

*The Evidence*

In 1999, Riverbend Pools, owned by Charles Barnes, merged with Sandler Pools, owned by Travis Bain, to form Texas Custom Pools. Barnes and Bain are the sole shareholders of Texas Custom Pools. Barnes owns a 60 percent interest and Bain owns a 40 percent interest. While the two men agreed to a 60/40 stock ownership split, they did not want income distributed according to this ratio because, at the time of the merger, Riverbend Pools contributed 66.53 percent of the combined income and Sandler Pools contributed 33.47 percent. To preserve this ratio, Bain and Barnes entered into a letter agreement addressing the compensation to be paid to the two shareholders after the merger. Under the agreement, Barnes and Bain each received an annual salary. Additionally, if the company's net income before bonus exceeded $2,376,384, Barnes would be paid a bonus which equaled 66.53 percent of net income before bonus and Bain would be paid a bonus which equaled 33.47 percent of net income before bonus. The $2,376,384 figure represents the combined income of the two companies at the time of the merger, and the percentage figures were based on each company's contribution to combined income: Riverbend Pools' contribution to the total amount was 66.53 percent and Sandler Pools' contribution was 33.47 percent. The merger would not have occurred without the compensation agreement.

Mondoux explained that near the end of each fiscal year, he would estimate the shareholders' individual taxes and the company would pay them a partial bonus in December to cover those taxes. Consequently, most of the bonus was deposited with the IRS through payroll for the shareholders' taxes. The remainder of the bonus was paid after the books had been balanced for the fiscal year. This usually occurred in the latter part of the following year.

The compensation due under the Letter Agreement was paid to the shareholders for 1999 through 2003, but beginning in 2004 and continuing through 2007, TCP was not able to pay them the entire amount due under the Letter Agreement due to cash flow issues. Initially, TCP did not accrue[2] the unpaid amounts to the shareholders, but in 2006, TCP's tax accountant advised the company that its reporting of "Shareholder/Officer Notes" did not conform to GAAP. The tax accountant advised the company to show the unpaid amounts on its books as liabilities payable to the shareholders because the money owed under the agreement is a legal liability. TCP and Mondoux followed this advice. At the end of 2006, TCP owed the shareholders $2,298,771.73 In addition to the unpaid amounts under the Letter Agreement, this figure includes balances on note agreements from 1999 and prior to the merger that were transferred to TCP.

TCP offered evidence of its net worth prior to filing the certificate of cash in lieu of supersedeas bond. Mondoux calculated the company's net worth from Schedule L of the federal tax years for 2002 through 2006 as follows:

---

[2] Mondoux testified that an accrual is a recognition of a liability in advance of paying it.

2002: negative ($52,737)

2003: negative ($157,640)

2004: $94,516

2005: $974,236

2006: negative ($216,096)

Because TCP had not accrued the liability for unpaid amounts to the shareholders in 2004, 2005, and 2006, he recalculated net worth for those years as follows:

2004: $11,500

2005: $94,516

2006: negative ($231.188).

On June 25, 2007, two days before it filed the certificate of cash in lieu of supersedeas bond, TCP took out a $1.3 million loan from Compass Bank to pay off and consolidate its debt to the shareholders. The loan is guaranteed by the shareholders and is secured by the shareholders' certificates of deposit. James Daniel LaFontaine, a relationship manager at Compass Bank, testified that the bank would not have approved the loan without the shareholders' guarantee.

TCP filed Mondoux's affidavit on June 27, 2007. A balance sheet, dated June 27, 2007, is attached to the affidavit. The balance sheet shows that TCP had total assets in the amount of $8,399,471.03 and total liabilities in the amount of $8,564,653.02 which results in a negative net worth of ($165, 181.99). Mondoux testified that he prepared the balance sheet in accordance with GAAP. In his opinion, the $1.3 million loan did not have any impact on TCP's net worth because the amounts owed to the shareholders was already reflected as a liability on the balance sheet. Counsel for the Claytons cross-examined Mondoux about financial reports submitted by TCP to Compass Bank as part of its compliance reporting. In particular, counsel asked Mondoux about a

compliance report dated March 31, 2007 which showed that TCP's tangible net worth[3] was $2, 264,086. Mondoux explained that this was not TCP's net worth because, at the request of the bank, shareholders' notes were excluded in the calculation. James LaFontaine confirmed that Compass Bank excluded shareholders' notes from the calculation of tangible net worth because it treated any loans payable to shareholders as equity as those notes would be subordinated.

Jack Van Wunnik, a CPA with Thomas O'Bailey & Associates, testified on behalf of TCP. In his opinion, the balance sheet dated June 27, 2007 was prepared in accordance with GAAP. He reviewed the 1999 Letter Agreement and concluded that it could create a liability and it would be appropriate for the chief financial officer to track the amounts paid and the amounts owed to the shareholders. Like Mondoux, Van Wunnik concluded that the $1.3 million loan would have no impact on the company's net worth because the liability existed prior to that transaction. Because the amount of liability was the same, the net worth remained the same.

Jack Sprawls, a CPA, testified on behalf of the Claytons. Although Sprawls initially stated that the 1999 Letter Agreement is a valid agreement, he criticized it because it is based on future profits and the compensation provided for in the agreement is not allocated based upon the efforts of the employee. He also believed the contract could be questioned by the IRS because its purpose is to avoid distributing income in proportion to stock ownership. In Sprawls' opinion, TCP would not have a negative net worth if the 1999 Letter Agreement were not in place, but he did not offer a calculation of net worth to support his opinion. Sprawls also viewed the 1999 Letter Agreement as improperly putting the shareholders in front of other creditors, such as the Claytons.

*Trial Court's Net Worth Calculation*

We proceed to address the propriety of the trial court's determination that certain

---

[3] Tangible net worth is total assets minus intangibles minus total liabilities.

"deductions" on the liability side of the balance sheet had to be added back into the net worth determination. At the hearing on their contest, the Claytons maintained that the 1999 Letter Agreement is invalid and it urged the trial court to add all of the sums paid to Bain and Barnes between 1999 and 2007 back into net worth. Although the trial court did not specify the basis for its ruling, the court found that the sums paid to Bain and Barnes from 1999 to 2006 were improper and had to be added back into the net worth calculation. Additionally, the court added back into the net worth calculation certain liabilities on the 2007 balance sheet. If the 1999 Letter Agreement is valid, the trial court abused its discretion by adding back into net worth the amounts paid to the shareholders from 1999 to 2006 and by adding back the liabilities shown on the 2007 balance sheet for amounts owed to the shareholders under the Letter Agreement.

*Validity of the 1999 Letter Agreement*

The Claytons maintain that the trial court properly added these sums back into the net worth calculation because the 1999 Letter Agreement lacks consideration. They argue, as they did in the trial court, that the Agreement is invalid because the disbursements to Barnes and Bain were not based on any efforts by them and they had already been paid salaries for their compensation. The Claytons contend that if an employee has a pre-existing duty to perform his job, a gratuitous promise of additional compensation for doing that job does not create a valid and enforceable contract.

Consideration is an essential element for a valid, enforceable contract. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 235 (Tex. 2003). Consideration is a "bargained-for" exchange of promises. *Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 496 (Tex. 1991). It can be either a benefit to the promisor or a detriment to the promisee. *Fort Worth Independent School District v. City of Fort Worth*, 22 S.W.3d 831, 841 (Tex. 2000). If mutual, reciprocal promises are binding on both parties, they may constitute consideration for a contract. *J.M. Davidson*, 128 S.W.3d at 235.

But, if the terms of a promise make performance optional, the promise is illusory and cannot constitute valid consideration. *J.M. Davidson*, 128 S.W.3d at 235.

James S. Ryan III, a partner at Jackson Walker L.L.P., worked on the merger of Riverbend Pools and Sandler Pools. Ryan's area of practice is corporate and securities, mergers, and acquisitions. He drafted the documents pertaining to the merger, including the Articles of Incorporation, the Assumed Name Certificate, the merger agreement, an executive agreement whereby Barnes and Bain agreed to continue to work for the company, and the 1999 Letter Agreement. In Ryan's opinion, there were two bases of consideration for the Letter Agreement: (1) Bain's and Barnes' agreement to merge the two companies; and (2) their executive agreement to continue to work for the surviving company. The Claytons do not address Ryan's testimony or the two bases for consideration testified about by him. We conclude that the 1999 Letter Agreement is supported by valid consideration and is not illusory.

The Claytons also seek to invalidate the Letter Agreement by asserting TCP did not intend to be bound by the agreement. The Claytons did not raise this argument in the trial court. In order to have a valid agreement, the parties must have expressed an intent to be bound, and in construing a written contract, the primary concern of an appellate court is to ascertain and to give effect to the intentions of the parties as expressed in the instrument. *R & P Enterprises v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 518 (Tex. 1980). The agreement reflects the parties intended to be bound by the agreement. The Claytons point to evidence that the shareholders were not always paid according to the terms of the agreement, but there is no evidence the shareholders ever took the position TCP did not owe them under the Agreement. Further, TCP acknowledged that it owed the shareholders by the accrual of the contractual shareholder liability. There is no evidence to support a finding that the parties did not intend to be bound by the 1999 Letter Agreement. We conclude that

the 1999 Letter Agreement is valid. The trial court erred by impliedly invalidating the 1999 Letter Agreement and abused its discretion by adding back into the net worth calculation the distributions paid to Bain and Barnes pursuant to that Agreement. Likewise, the court abused its discretion by adding back into net worth the sum of $234,668.92 which is shown as accrued liabilities on the 2007 balance sheet for an amount owed to the shareholders pursuant to the Agreement.

*1999 - 2006 Distributions*

Even if we found that the 1999 Letter Agreement is invalid, the trial court abused its discretion by adding back in to the net worth calculation the sums paid to the shareholders from 1999 to 2006.[4] The distributions paid to Bain and Barnes between 1999 and 2006 are obviously not reflected in the June 27, 2007 balance sheet.[5] These sums could only be added back in as shareholder equity. By adding these amounts back into the net worth calculation, the trial court necessarily assumed that the profits would not have been distributed to the shareholders as dividends in a 60/40 ratio according to their stock ownership even though the shareholders would have been taxed on each year's profits with or without a distribution. There is no evidence that the profits would not have been distributed to the shareholders. Given that the profits were effectively distributed to the shareholders during these years under the terms of the Letter Agreement, the only reasonable inference is that the profits would have been distributed to the shareholders even absent the agreement albeit in a different ratio. The trial court abused its discretion by adding these sums back into the balance sheet and the net worth calculation.

---

[4] These sums are as follows: $1,980,320.00 (1999); $2,376,384.00 (2000); $382,500.00 (2001); $789,100.00 (2002); $780,000.00 (2003); $522,578.00 (2005); and $715,959.87 (2006).

[5] Evidence admitted at the contest hearing showed that Bain and Barnes were due to receive a total of $252,156 for 2004 but received nothing. For 2005, the total amount payable under the Letter Agreement was $1,402,298 but they were paid a total of $522,578, leaving a balance owed of $879,720. For 2006, the total amount payable was $969,240.66, but they were paid a total of $715,959.89, leaving a balance owed of $253,280.77. The total amounts owed for 2005 and 2006 was $1,133,000.77.

*2007 Other Accrued Liabilities*

There is one additional liability which must be addressed. The trial court added back into TCP's net worth one item which is included in "Accrued Liabilities" on the June 27, 2007 balance sheet. Note 6 to the balance sheet addresses Accrued Liabilities. It reflects that the company accrues salaries, payroll taxes, sales taxes, property taxes, equivalents to income taxes, and contractual shareholder obligations based on generally accepted accounting principles. On June 27, 2007, the Accrued Liabilities consisted of Accrued Salaries and Wages ($526,357.02), Accrued Payroll Taxes Payable ($90,618.35), Sales and Property Taxes Payable ($195,397.48), Distribution Payable in Lieu of Income Taxes ($234,668.92), Unclaimed Gift Cards ($48,033.26), Contractually Required Shareholder Payment ($435,813.70), Employee Garnishments Payable ($13,214.19), and Other Accrued Liabilities ($43,526.01). The court added back into net worth the sum of $43,526.01, which is other accrued liabilities. There is no basis for the trial court's disallowance of other accrued liabilities as no testimony was admitted at the hearing about this liability.[6] The trial court abused its discretion by adding the sum of $43,526.01 back into TCP's net worth.

*The Compass Bank Loan*

The trial court also added the entire $1.3 million loan proceeds back into the net worth calculation. The court did not specify the basis for its ruling, but the loan proceeds could be added back into net worth only if the court found that the payment of the loan proceeds to the shareholders was a fraudulent conveyance under the Uniform Fraudulent Transfer Act found in Chapter 24 of the Texas Business and Commerce Code.

---

[6] We assume the trial court intended to disallow the liability for contractually required shareholder payment in the sum of $435,813.70 but mistakenly disallowed other accrued liabilities. Because we have found the 1999 Letter Agreement to be valid, the trial court would have also abused its discretion by adding back into net worth the sum of $435,813.70.

Sections 24.005 and 24.006 contains several provisions under which a transfer can be found fraudulent as to present and future creditors. The judgment creditor has the burden to prove the fraudulent transfer by a preponderance of the evidence. *G.M. Houser*, 204 S.W.3d at 842. We will examine each of these provisions to determine whether the evidence is legally sufficient to support an affirmative finding that TCP made a fraudulent transfer when it transferred the loan proceeds to the shareholders. In conducting this analysis, we apply the traditional legal sufficiency or "no evidence" standard. When the party without the burden of proof suffers an unfavorable finding, the challenge on appeal is one of "no evidence to support the finding." *Serrano v. Union Planters Bank, N.A.*, 162 S.W.3d 576, 579 (Tex.App.--El Paso 2004, pet. denied). A legal sufficiency or "no evidence" challenge will be sustained on appeal if the record shows: (1) the complete absence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *Carrasco v. Stewart*, 224 S.W.3d 363, 367 (Tex.App.--El Paso 2006, no pet.), *citing City of Keller*, 168 S.W.3d at 810. In reviewing a legal sufficiency challenge, we view the evidence in the light most favorable to the judgment, crediting favorable evidence if a reasonable juror could, and disregarding contrary evidence if a reasonable juror could not. *City of Keller*, 168 S .W.3d at 807. We are to consider the evidence in the light most favorable to the verdict, and indulge every reasonable inference that would support it. *Id*. at 822. However, if the evidence allows of only one inference, the trier of fact may not disregard it. *Id*. When a no evidence point of error rests on the competency of the evidence, we may not disregard contrary evidence showing it to be incompetent. *Id*. at 812.

Section 24.006 addresses transfers which are fraudulent as to present creditors. TEX.BUS.& COM.CODE ANN. § 24.006 (Vernon 2002). Both of its subsections require proof that the debtor was

insolvent at the time the debtor made the transfer or incurred the obligation. *Id.* The trial court expressly found in its order that TCP was not insolvent and the Claytons have not challenged that finding on appeal. Thus, Section 24.006 could not have been the basis of the trial court's ruling.

Section 24.005 provides:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or

(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

> (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>
> (B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

TEX.BUS.&COM.CODE ANN. § 24.005(a).

The Claytons argue that TCP transferred the loan proceeds to the shareholders without receiving a reasonably equivalent value in exchange for the transfer but they do not address the elements found in (A) and (B). The record does not contain any evidence that TCP was engaged or was about to engage in a business or transaction for which the remaining assets of TCP were unreasonably small as required for finding a transfer fraudulent under Section 24.005(a)(2)(A). Likewise, there is no evidence that TCP intended to incur, or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due as required for finding a transfer fraudulent under Section 24.005(a)(2)(B). We therefore find the evidence legally insufficient to support a finding of fraudulent transfer under Section 24.005(a)(2).

The only remaining basis for finding the transfer fraudulent is under Section 24.005(a)(1). Under this section, the creditor must prove that the debtor made the transfer or incurred the obligation with actual intent to hinder, delay, or defraud any creditor of the debtor. Direct proof of fraudulent intent is often unavailable. *G.M. Houser*, 204 S.W.3d at 842. Therefore, circumstantial evidence may be used to prove fraudulent intent. *Id.* Section 24.005(b) sets out a non-exhaustive list of "badges" of fraud to be considered in determining whether a transfer was made with actual intent to defraud. TEX.BUS.&COM.CODE ANN. § 24.005(b)(1)-(11). The "badges" include the following:

(1) the transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer or obligation was concealed;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

TEX.BUS.&COM.CODE ANN. § 24.005(b)(1)-(11). An individual badge of fraud is not conclusive,

but "a concurrence of many [badges] in the same case will always make out a strong case of fraud." *G.M. Houser*, 204 S.W.3d at 843, *quoting Adams v. Wilhite*, 636 S.W.2d 851, 856 (Tex.App.-- Tyler), *rev'd on other grounds*, 640 S.W.2d 875 (Tex. 1982). We will examine the badges in numerical order.

1. The first badge of fraud is found where the transfer is made to an insider. It is undisputed that TCP's shareholders are insiders. *See* TEX.BUS.&COM.CODE ANN. § 24.002(7)(B)(defining insider of a corporation to include an officer of the debtor and a person in control of the debtor). While evidence of a transfer to an insider is one factor to consider in determining actual intent to defraud, that fact alone does not support a conclusion the transfer constitutes a fraudulent transfer. *G.M. Houser*, 204 S.W.3d at 843; TEX.BUS.&COM.CODE ANN. § 24.005(b)(1)(Vernon 2002)(in determining actual intent to defraud, consideration may be given, among other factors, to whether transfer to insider); *Adams*, 636 S.W.2d at 856 (evidence of individual badge of fraud not conclusive).

2. There is no evidence that TCP retained possession or control of the funds paid to Bain and Barnes.

3. There is no evidence that the transfer was concealed.

4. A judgment had been entered in favor of the Claytons in March of 2007 and they had been taking steps to enforce the judgment before TCP took out the loan and paid the proceeds to the shareholders.

5. The evidence does not support a finding that the transfer was of substantially all of TCP's assets. To the contrary, the balance sheet reflects total assets in the amount of $8,399,471.03.

6. TCP did not abscond.

7. TCP did not remove or conceal assets.

8. TCP borrowed $1.3 million to pay the shareholders the sums owed them under certain notes and amounts due under the 1999 Letter Agreement.[7] The eighth badge examines whether the value of the consideration received by TCP was reasonably equivalent to the value of the asset transferred. Section 24.004(a) provides that value is received when an antecedent debt is satisfied. There is no evidence that would support a finding in favor of the Claytons under this badge.

9. The trial court expressly found that TCP is not insolvent.

10. The transfer occurred three months after the judgment was entered in favor of the Claytons. TCP disputes that the judgment is substantial. According to the June 27, 2007 balance sheet, TCP's total current liabilities were $5,387,575.81 and its long-term debt, which includes the $1.3 million loan, was $3,177,077.21. We believe a fact-finder could reasonably find that a judgment in the amount of $1,269,829 is substantial.

11. Finally, there is no evidence that TCP transferred the essential assets of the business to a lienor who transferred the assets to the shareholders.

The only badges which the trial court could have found in favor of fraud are the first, fourth, and tenth badges. These are only three out of a non-exclusive list of eleven badges and they are not particularly strong even when considered together. We conclude that the evidence is legally insufficient to prove that TCP paid the shareholders the money they were owed with actual intent to hinder, delay, or defraud the Claytons. Therefore, the trial court abused its discretion by adding the $1.3 million dollar loan proceeds back into TCP's net worth. Based on the foregoing, we conclude that the trial court abused its discretion by determining that TCP's net worth is

---

[7] The evidence admitted at the contest hearing established that the purpose of the loan was to consolidate the corporation's debt to the shareholders. According to Mondoux, Bain and Barnes had loaned TCP $1.9 million in 1999 and the company still owed them between $300,000 and $400,000 in 2007. This debt is unrelated to the 1999 Letter Agreement.

$8,681,659.87.

*TCP's Proof of Net Worth*

TCP offered evidence of its net worth through its CFO. At the hearing on the contest, TCP offered evidence that its balance sheet was in accordance with GAAP. Even the Claytons' expert, Jack Sprawls, agreed that the balance sheet appeared to be proper. His complaints were not with the balance sheet but with the 1999 Letter Agreement. We conclude that TCP met its burden under Section 52.006(c) of the Civil Practice and Remedies Code and under Rule 24.2(c)(3) to establish as a matter of law that its net worth as of June 27, 2007 was a negative ($165,182).

*The Injunction*

Finally, we consider the propriety of the injunction. The trial court enjoined TCP from dissipating or transferring assets to avoid satisfaction of the judgment held by the Claytons, including the payment of any bonus or repayments of any debts to or on behalf of Charles Barnes, Travis Bain or any other shareholder or owner of Texas Custom Pools. Rule 24.2(d) authorizes the trial court to "enjoin the judgment debtor from dissipating or transferring assets to avoid satisfaction of the judgment" pending an appeal in civil cases. TEX.R.APP.P. 24.2(d). We review a trial court's order enjoining a judgment debtor from dissipating or transferring assets to avoid satisfaction of the judgment under an abuse of discretion standard. *Emeritus Corporation v. Ofczarzak*, 198 S.W.3d 222, 225 (Tex.App.--San Antonio 2006, no pet.). The trial court is required to determine whether the judgment debtor is likely to dissipate or transfer its assets to avoid satisfaction of the judgment. *Id.* at 227. The trial court abuses its discretion in ordering a post-judgment injunction if the only reasonable decision that could be drawn from the evidence is that the judgment debtor would not dissipate or transfer its assets. *Id.*

We have found the evidence legally insufficient to support a finding that TCP's payment of

the loan proceeds to the shareholders was a fraudulent conveyance. Further, the evidence admitted at the hearing reflects that TCP is an ongoing enterprise with substantial assets. Given the absence of evidence that TCP has dissipated or transferred its assets to avoid satisfaction of the judgment, there was no evidence presented to the trial court that it would do so in the future. We therefore conclude that the trial court abused its discretion by entering the post-judgment injunction.

For all of these reasons, we grant TCP's motion and reverse the trial court's order in its entirety. Further, we order that TCP's net worth is a negative ($165,182) as reflected in Mondoux's affidavit and the June 27, 2007 balance sheet.

March 12, 2009

ANN CRAWFORD McCLURE, Justice

Before Chew, C.J., McClure, and Rivera, JJ.