**Opinion issued August 23, 2018**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-16-01008-CV

————————————

**JAMIE W. JONES AND OBES, INC., Appellants**

**V.**

**DYNA DRILL TECHNOLOGIES, LLC F/K/A DYNA DRILL TECHNOLOGIES, INC., Appellee**

On Appeal from the 281st District Court
Harris County, Texas
Trial Court Case No. 2014-62251

## MEMORANDUM OPINION

Dyna Drill Technologies, LLC sued Jamie W. Jones and OBES, Inc. for

damages arising under the Texas Uniform Fraudulent Transfer Act. *See* TEX. BUS.

& COM. CODE §§ 24.001–.013. A jury found Jones and OBES liable for fraudulent

transfer, with damages of $62,500. The trial court awarded to Dyna Drill attorney's fees, pre- and post-judgment interest, and costs of court.

On appeal, Jones and OBES challenge the legal and factual sufficiency of the evidence to support the jury's verdict that they were liable for fraudulent transfer and that Dyna Drill's claims were timely filed. They also challenge the award of attorney's fees as unreasonable and not properly segregated.

Finding that the appellate record supports the trial court's judgment, we affirm.

**Background**

Dyna Drill Technologies, LLC is a manufacturing company that manufactures and repairs equipment used for directional drilling of oil-and-gas wells. Ole Brook Energy Services, Inc. was a drilling company that was founded in 2005 by its sole owner, Jamie Jones. From July 2008 through January 2009, Ole Brook Energy purchased equipment and obtained repair services, on account, from Dyna Drill.

After a downturn in the oil-and-gas business at the end of 2008 and beginning of 2009, Ole Brook Energy fell behind on its payments to Dyna Drill. In December 2009, Dyna Drill sued Ole Brook Energy in Johnson County.

In March 2010, while the Johnson County litigation was pending, Jones formed OBES, Inc., and he filed a certificate designating "Ole Brook Directional Services" as its assumed name. Jones was the sole owner and president of both Ole

2

Brook Energy and OBES, and both businesses operated from the same location and employed the same bookkeeper. In June 2010, Ole Brook Energy sold five vehicles and some, but not all, of its directional-drilling equipment to OBES for $96,420.13, due to be paid twenty years later, in 2030. On July 30, 2010, the Secretary of State notified Ole Brook Energy that its charter was forfeited for "failure to file a franchise tax return and/or pay state franchise tax." In October 2010, Ole Brook Energy sold the remainder of its equipment to OBES for unspecified "good and valuable consideration." At trial, Jones testified that the value of the assets transferred in October was approximately $200,000 and that OBES never paid any money to Ole Brook Energy.

Dyna Drill was not informed about these transactions. On December 17, 2010, it entered into a settlement agreement with Ole Brook Energy in the Johnson County case. The parties signed an agreed judgment for the entire amount of the unpaid debt, in the amount of $106,420.13. Ole Brook Energy promised to pay $1,000 per month on the debt, which was to be secured by the agreed judgment. Dyna Drill promised to hold the agreed judgment in trust and file it only if Ole Brook Energy failed to pay or cure a delinquent payment under the terms of the settlement agreement.

Dyna Drill began receiving scheduled payments made by checks from "Ole Brook Directional Services, Inc.," which had notes on the memo line reading: "Olebrook Energy Acc't." Two years after the settlement agreement, Jones filed for

3

reinstatement of Ole Brook Energy's charter, and the following day the business was terminated "due to total insolvency." Nevertheless, the scheduled payments under the settlement agreement continued until 2014. Then Dyna Drill filed the agreed judgment.

Dyna Drill subsequently filed suit against Jones in Harris County to recover the outstanding balance of $62,500. It asserted claims for fraud and fraudulent transfer. In particular, Dyna Drill alleged that Jones transferred the assets of Ole Brook Energy to OBES for little to no consideration and that this transfer was fraudulent because it depleted assets that should have been available to satisfy debts owed to Ole Brook Energy's creditors. Dyna Drill also alleged that at the time of the transfer, Ole Brook Energy was unable to pay its creditors, and it had been sued or threatened with suit. Dyna Drill contended that these transfers were made for the benefit of Jones, who was an insider of Ole Brook Energy when the transfer was made.

In 2015, Dyna Drill took Jones's deposition. Jones testified about the formation of OBES and the asset transfers. In June 2015, approximately eight months after the original petition was served on Jones, Dyna Drill sued OBES. Among other defenses, Jones and OBES pleaded the affirmative defense that a statute of repose rendered the claim against them untimely.

4

At trial Catherine Braxton, the customer-services manager for Dyna Drill, testified that she oversaw employees and customer accounts. Braxton confirmed that when Dyna Drill agreed to settle the Johnson County suit, it had not received information about the formation of OBES or the transfer of assets from Ole Brook Energy. Although Dyna Drill received checks from "Ole Brook Directional Services, Inc.," Braxton was unaware of any company by that name. She testified: "We didn't do any other business with any other company that had Ole Brook in its name. So it was always thought that these checks were coming to pay for the Ole Brook Energy Services, Inc. amount, and we never thought differently."

Dyna Drill first received the information that Ole Brook Energy no longer existed after it hired a lawyer to execute the agreed judgment from the Johnson County suit. Dyna Drill also discovered that Jones had continued to do directional drilling under the name OBES or Ole Brook Directional Services. According to Braxton, Dyna Drill was unaware of the asset transfers from Ole Brook Energy to OBES until Jones's deposition. Braxton maintained that Dyna Drill would not have entered into a settlement agreement with Ole Brook Energy in 2010 if it had been informed about the asset transfers in June and October 2010 or the tax forfeiture. On cross-examination, Braxton testified that she did not investigate whether Ole Brook Energy had paid its taxes prior to the settlement agreement, but she "supposed" that may have been a reasonable thing to do. She also did not investigate the source of

5

the payments that were made on "Ole Brook Directional Services" checks because Dyna Drill was "receiving the agreed-upon payments." Braxton testified: "There was never any reason to go look further for any other problems. We were getting the payments at this time."

Jones was the only other witness at trial. He testified that he was the sole owner and president of both Ole Brook Energy and OBES. He did not dispute the accuracy of the invoices and charges from Dyna Drill. He acknowledged that he transferred assets out of Ole Brook Energy at a time when it owed money to Dyna Drill and other creditors and during the Johnson County litigation. Jones did not inform Dyna Drill about asset transfers to OBES. He stated: "I didn't know that I needed to." He said his deposition was the first time he "was asked."

Jones said he did not intend to defraud creditors when he made the June and October 2010 asset transfers. He said he was trying to pay the creditors. Jones had considered bankruptcy, but he decided against it after talking to several people. Jones did not identify them at trial, and he conceded that they were not bankruptcy experts. He testified that he tried to sell some of the equipment, but ultimately he decided against liquidating assets because everybody he consulted about buying the equipment "was not interested or was offering way less than what it was worth." He conceded that he had spoken with only two individuals in Houston about selling motors used in directional drilling, and only one person and one company about

equipment. He made no attempt to sell any equipment by auction. Jones said that he had previously tried to sell equipment during his 30-year career, but he never had been successful. With respect to the vehicles formerly owned by Ole Brook Energy, Jones testified that he sold a pickup truck to an employee for $9,000, he was driving one truck, and he gave a sport utility vehicle to his daughter.

Rather than declaring bankruptcy or liquidating his business, Jones continued directional-drilling work, operating through OBES. He represented that he had created OBES and transferred the Ole Brook Energy assets so that he could "do business to try to pay the debts that were owed by Ole Brook Energy Services, Inc. at the time."

Jones maintained that Ole Brook Energy received value from the asset transfers, despite receiving no cash consideration, because OBES paid some of its debt. He testified that over $400,000 of Ole Brook Energy's debts to all of its creditors had been repaid by OBES. He also testified that the total value of the assets transferred in June 2010 was $96,420.13, as stated in a promissory note that was admitted as evidence, and he said that the value of the assets transferred in October 2010 was $200,000.

On cross-examination, Jones explained why he thought it was better to form a new company to conduct the same business as the old company:

7

Q. So what specifically was it about transferring the assets that allowed you to do business better than you could have with the first company?

A. We were having issues with people trying to collect their money that they were owed, so it was easier with us being able to have money that we could get in and to pay the bills and to maintain operations to pay more bills.

. . . .

Q. So it was easier to do business with the new company because it was easier for the new company to evade the old company's creditors, right?

A. No, it was easier to pay them creditors.

Q. How was it easier to pay those creditors?

A. Because I could pay who I could pay. I could pay everybody that I could possibly pay.

Q. Why couldn't you have done that with the old company? Why couldn't you have paid who you could possibly pay with the old company?

A. Because you have creditors that will come in and garnish your bank accounts and do other things like that where I can't pay creditors.

Jones testified that he stopped making scheduled payments under the settlement agreement when OBES experienced financial difficulty in 2014. But he did not contact Dyna Drill about the payments because OBES had been making those payments "out of goodwill." Jones said: "I didn't feel that OBES, Inc. was—needed to. We are not—the debt is not with OBES, Inc.; it was with Ole Brook Energy Services."

8

Because the parties agreed before trial to try the issue of attorney's fees to the trial court, the jury questions concerned liability, damages, and the statute of repose. The jury found that Ole Brook Energy transferred its assets to OBES "with the actual intent to hinder, delay, or defraud" Dyna Drill; the value of the property transferred in 2010 was $296,420.13; Dyna Drill was owed $62,500; and the asset transfers were made for Jones's benefit. Finally the jury found that Dyna Drill filed its fraudulent transfer claims against Jones and OBES within one year after it "did discover or could reasonably have discovered" that Ole Brook Energy had transferred the assets listed on the June and October 2010 bills of sale.

In a post-trial motion, Dyna Drill sought over $74,000 for attorney's fees and expenses. It supported its lawyer's affidavit with unredacted billing records and invoices.

Jones and OBES opposed the attorney's fees award, arguing that it would not be just or equitable to require them to pay attorney's fees when Jones's actions in operating as OBES allowed for the payment of more than $400,000 to Ole Brook Energy's creditors. They argued that Jones's actions resulted in a more favorable result for creditors of Ole Brook Energy than could have been obtained by liquidation or bankruptcy. In addition, they objected that the fees were not segregated between the fraudulent-transfer claim and a Tax Code claim which was

9

nonsuited before trial. Finally, Jones and OBES's attorney averred that the billable rates and certain specific charges were not reasonable.

The trial court awarded $59,000 in reasonable and necessary attorney's fees through trial, as well as contingent appellate attorney's fees. In its findings of fact and conclusions of law, it stated that it had disregarded some entries from the billing records based on the evidence, objections, arguments of counsel, and the partial agreement of Dyna Drill's counsel. It found that the hourly rates were consistent with those charged by other attorneys in the area providing the same type of services and that the fees were reasonable based on the time and labor required; the novelty and difficulty of the questions involved; the skill required to perform the legal services properly; the amount in controversy and the results obtained; and the experience, reputation, and ability of the lawyers performing the services.

After their motion for new trial was overruled by operation of law, Jones and OBES appealed.

## Analysis

On appeal, Jones and OBES argue that the evidence was legally and factually insufficient to support the jury's verdict on liability and the application of the statute of repose. They also challenge the award of attorney's fees as unreasonable and the amount of fees as unsupported by properly segregated evidence.

10

## I.	Sufficiency of the evidence

The jury found that Ole Brook Energy "transfer[red] the property in the June 10, 2010 Bill of Sale and the October 15, 2010 Bill of Sale to OBES with the actual intent to hinder, delay, or defraud any creditor of the debtor." *See* TEX. BUS. & COM. CODE § 24.005(a)(1). The jury also found that Dyna Drill filed its claims against Jones and OBES within one year after it discovered or reasonably could have discovered that Ole Brook Energy had transferred the assets described in the June and October 2010 bills of sale to OBES. Jones and OBES challenge the legal and factual sufficiency of the evidence to support these findings.

We review legal-sufficiency challenges to determine whether the evidence "would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). Evidence is legally insufficient if the record shows a complete absence of proof of a vital fact, the lone proof supporting the judgment is incompetent and cannot be considered, the proof is no more than a scintilla of evidence and jurors would have to guess whether a vital fact exists, or the proof conclusively shows the opposite of a vital fact. *See id.* at 811–14. We review the evidence in the light most favorable to the judgment. *See id.* at 822. The factfinder is the sole judge of the weight and credibility of the evidence. *See id.* at 819.

To determine the factual sufficiency of the evidence, we are required to examine all of the evidence, and we will set aside the judgment only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). Unlike a legal-sufficiency review, a factual-sufficiency review requires that we review the evidence in a neutral light. *Nelson v. Najm*, 127 S.W.3d 170, 174 (Tex. App.— Houston [1st Dist.] 2003, pet. denied). The trier of fact may choose to "believe one witness and disbelieve others" and "may resolve inconsistencies in the testimony of any witness." *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986); *see also City of Keller*, 168 S.W.3d at 820.

## A.     Actual-intent fraudulent transfer

The jury found that Ole Brook Energy transferred property in June and October 2010 to OBES "with the actual intent to hinder, delay, or defraud any creditor of the debtor." *See* TEX. BUS. & COM. CODE § 24.005(a)(1). Jones and OBES contend that this answer is not supported by legally sufficient evidence because some of the statutory factors relevant to a determination of actual intent were not satisfied, and the evidence to support the others was weak. In addition, they argue that the evidence is legally insufficient because OBES's payment of Ole Brook Energy's debt conclusively negated intent to defraud. Similarly, they argue that the evidence is factually insufficient to support the jury's answer because the evidence that OBES

12

paid Ole Brook Energy's debts after the transfer outweighs any evidence of intent to defraud.

The Texas Uniform Fraudulent Transfer Act was "designed to protect creditors from being defrauded or left without recourse due to the actions of unscrupulous debtors." *KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 89 (Tex. 2015). Under the statute, a creditor may set aside a debtor's fraudulent transfer of assets or obtain a judgment for money damages up to the value of the assets transferred. *See* TEX. BUS. & COM. CODE §§ 24.008, 24.009(b)–(c); *Chu v. Chong Hui Hong*, 249 S.W.3d 441, 446 (Tex. 2008).

A creditor may prevail on a claim of fraudulent transfer by showing that a transfer was made or an "obligation incurred" by a debtor "with actual intent to hinder, delay, or defraud any creditor of the debtor." TEX. BUS. & COM. CODE § 24.005(a)(1). "Actual fraudulent intent is rarely susceptible to direct proof; therefore, the requisite intent may be proved circumstantially by presenting evidence of certain 'badges of fraud' that may cumulatively give rise to an inference of intent to hinder, delay, or defraud." *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 370 (S.D. Tex. 2008); *see also Nwokedi v. Unlimited Restoration Specialists, Inc.*, 428 S.W.3d 191, 203–05 (Tex. App.—Houston [1st Dist.] 2014, pet. denied). In determining whether the debtor acted with actual intent, the factfinder may consider whether:

13

(1)     the transfer or obligation was to an insider;

(2)     the debtor retained possession or control of the property transferred after the transfer;

(3)     the transfer or obligation was concealed;

(4)     before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5)     the transfer was of substantially all the debtor's assets;

(6)     the debtor absconded;

(7)     the debtor removed or concealed assets;

(8)     the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9)     the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10)    the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11)    the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

TEX. BUS. & COM. CODE § 24.005(b). These statutory factors—sometimes called "badges" of fraud—are non-exclusive, and no single factor alone can prove fraud per se. *Hahn v. Love*, 321 S.W.3d 517, 525–26 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). "Intent is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be

given to their testimony." *Id.* (quoting *Flores v. Robinson Roofing & Constr. Co.*, 161 S.W.3d 750, 754 (Tex. App.—Fort Worth 2005, pet. denied)).

At trial Dyna Drill argued that all of the factors, except the second and eleventh, were satisfied in this case. In closing argument, Dyna Drill conceded that that the second factor, whether the debtor retained possession or control after the transfer, did not apply because Ole Brook Energy ceased to exist after the transfer. Dyna Drill also argued to the jury that the eleventh factor, whether assets were transferred to a lienor, did not apply.

### 1. Legal sufficiency

Jones and OBES do not challenge the legal sufficiency of the evidence to support the first, fourth, fifth, and ninth statutory factors. The transfer of assets from Ole Brook Energy to OBES was undisputedly to an insider. *See* TEX. BUS. & COM. CODE § 24.002(7)(B) (defining "insider"); *Hahn*, 321 S.W.3d at 525 n.8 (stating that insider status is not "limited to the four subjects listed in section 24.002(7)"); *Tel. Equip. Network, Inc. v. TA/Westchase Place, Ltd.*, 80 S.W.3d 601, 609 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (stating that an insider is "an entity whose close relationship with the debtor subjects any transactions made between the debtor and the insider to heavy scrutiny"). The appellants agree that Dyna Drill sued Ole Brook Energy in 2009, before the transfers were made. Finally, they admit that

15

"substantially all" of the assets of Ole Brook Energy were transferred to OBES, leaving Ole Brook Energy insolvent.

### a. Concealment of transfer or assets

The third statutory factor concerns whether the transfer was concealed, and the seventh factor concerns whether the debtor removed or concealed assets. Without reference to authority, Jones and OBES argue that there was no evidence of concealment because they did not use "fictitious names in the bill of sale" or "otherwise attempt to cover up the transfers." They also contend that the fraudulent-transfer statute would be "extremely dangerous" if creditors could prove concealment simply because they were not told about a transfer.

Jones testified that he created and operated his directional-drilling business as OBES instead of Ole Brook Energy "because you have creditors that will come in and garnish your bank accounts and do other things like that where I can't pay creditors." This was circumstantial evidence that Jones understood that the assets transferred from Ole Brook Energy to OBES would not be available to creditors attempting to collect a debt. *See ASARCO*, 396 B.R. at 388 (intent to hinder, delay, or defraud creditors may be inferred from debtor's actions taken with knowledge that proceeding with a transaction as structured was substantially certain to hinder, delay, or defraud creditors); *Nwokedi*, 428 S.W.3d at 206–07; *cf.* RESTATEMENT (SECOND) OF TORTS § 8A (1965) ("The word 'intent' is used . . . to denote that the

16

actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it."). Moreover, while Jones testified that he wanted to pay the creditors, the jury was free to disregard this testimony if it determined that it was not credible. *Flores*, 161 S.W.3d at 754 (intent depends on the credibility of the witnesses).

Jones did not inform Dyna Drill about the asset transfers before the parties entered into the settlement agreement, though the transfer of all of the assets away from Ole Brook Energy meant that there were no assets available for collection and no equipment available to enable Ole Brook Energy to earn money and make the scheduled payments. This is some evidence that both the transfer and the assets themselves were concealed. *Cf. In re Cowin*, No. 13-30984, 2014 WL 1168714, at *18 (Bankr. S.D. Tex. Mar. 21, 2014) (in bankruptcy proceeding, considering omission of material facts to be evidence of concealment of transfer).

### b. *Debtor's abscondence*

The sixth statutory factor considers whether the debtor absconded. Again without reference to authority, Jones and OBES contend that there was no evidence that the debtor absconded because dissolving a legal entity does not constitute absconding. "Abscond" is not defined by the fraudulent-transfer statute. *See* TEX. BUS. & COM. CODE § 24.002. At the time this provision was enacted, *Black's Law Dictionary* defined "abscond" as: "To go in a clandestine manner out of the

17

jurisdiction of the courts, or to lie concealed, in order to avoid their process. To hide, conceal, or absent oneself clandestinely, with the intent to avoid legal process." *Abscond*, BLACK'S LAW DICTIONARY (5th ed. 1979).

In considering the statutory "badges" of fraud, at least one bankruptcy court has held that the transfer of assets by a business in conjunction with that entity ceasing to operate was "a form of absconding to avoid collection." *Sherman v. Netsch (In re Prism Graphics, Inc.)*, No. 08-31914-HDH-7, Adversary No. 10-3092-HDH, 2014 WL 3844623, at \*4 (Bankr. N.D. Tex. Aug. 5, 2014). Another bankruptcy court has found that a debtor absconded by avoiding service of process. *West v. Seiffert (In re Houston Drywall, Inc.)*, Case No. 05–95161–H4–7, Adv. No. 06–03415, 2008 WL 2754526, at \*23 (Bankr. S.D. Tex. July 10, 2008).

The evidence showed that Ole Brook Energy transferred its assets to OBES, and after that time it ceased operations. Jones, who controlled both entities, testified that he made the transfer to avoid collection efforts by creditors. This was some evidence that Ole Brook Energy absconded within the meaning of the statutory badges of fraud.

### c.      *Failure to pay reasonably equivalent value*

The eighth statutory factor considers whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred.

18

The jury found the value of the assets transferred to be $296,420.13, and this finding has not been challenged on appeal.

Jones and OBES argue that the evidence was legally insufficient to support this factor because there was evidence that OBES paid $304,846.19 to creditors of Ole Brook Energy. Because this repayment exceeds the value of the assets transferred, Jones and OBES contend that Ole Brook Energy received reasonably equivalent value for the assets that were transferred to OBES.

Both "value" and the related concept of "reasonably equivalent value" have been statutorily defined in this context as follows:

> (a) Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person.
>
> . . . .
>
> (d) "Reasonably equivalent value" includes without limitation, a transfer or obligation that is within the range of values for which the transferor would have sold the assets in an arm's length transaction.

TEX. BUS. & COM. CODE § 24.004; *see Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 569 (Tex. 2016).

"[B]oth value and reasonable equivalency are determined as of the time of the transaction, not in hindsight." *Janvey*, 487 S.W.3d at 569. To constitute value or

19

reasonably equivalent value, the transfer itself must "confer some direct or indirect economic benefit to the debtor, as opposed to benefits conferred solely on a third-party, transfers that are purely gratuitous, and transactions that merely hold subjective value to the debtor or transferee." *Id.* at 574.

The evidence showed that Ole Brook Energy signed bills of sale in June and October 2010 transferring all of its property to OBES. In exchange for the property transferred in June, OBES executed a promissory note in June 2010, which provided that the entire principal amount of $96,420.13 was due in June 2030. The October 2010 bill of sale simply stated that OBES gave "good and valuable consideration" in exchange for the Ole Brook Energy property. And Jones testified that OBES never paid anything to Ole Brook Energy.

Jones and OBES contend that Ole Brook Energy received value because they paid its creditors. But Jones testified that the debts were paid "out of goodwill," and that he did not regard OBES to be obligated to satisfy Ole Brook Energy's debt to Dyna Drill. There was no evidence at trial that any debt was satisfied in exchange for the property from Ole Brook Energy.

In light of Jones's testimony that Ole Brook Energy never received any payments in exchange for the property that was transferred, the evidence supported a conclusion that it received no more than an unperformed promissory note. This did not constitute value for purposes of the fraudulent-transfer statute. *See* TEX. BUS. &

20

COM. CODE § 24.004(a) ("value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person"). Consequently, there was some evidence that Ole Brook Energy did not receive reasonably equivalent value in exchange for the transfer of assets.

### d. Timing of transfer relative to incurring substantial debt

The tenth factor considers whether the transfer occurred shortly before or shortly after a substantial debt was incurred. Jones and OBES contend that there was no evidence of this factor because Ole Brook Energy's debt to Dyna Drill was incurred in 2008 and 2009 when the purchases were made. They contend that the settlement agreement was the renewal of a preexisting debt, not a new obligation. Dyna Drill responds that the settlement agreement was a new obligation.

The original petition in the Johnson County case was admitted as evidence at trial, as was the settlement agreement. In that case, Dyna Drill sought to recover the unpaid outstanding debt of $106,541.43, 18% interest, and attorney's fees. The settlement agreement provided for a repayment schedule of $1,000 per month until a balance of $106,000 was repaid. But the settlement agreement did not finally settle the lawsuit. Dyna Drill did not agree to dismiss the suit; it only agreed to abate it and afford Ole Brook Energy an opportunity to repay the existing, acknowledged debt.

21

The evidence is undisputed that Ole Brook Energy entered into a binding settlement agreement in December 2010, when it had no charter and no assets.

The jury was entitled to consider these facts when assessing the totality of the evidence to determine if there was evidence of actual intent to hinder, delay, or defraud Dyna Drill.

* * *

Jones and OBES argue that the evidence is legally insufficient because the evidence was too weak to show actual intent. However, the evidence adduced at trial supported nearly all of the statutory badges of fraud. It is undisputed that Ole Brook Energy transferred substantially all of its assets to an insider after it was sued by Dyna Drill, leaving it insolvent. In addition, Jones testified that he transferred Ole Brook Energy's assets to OBES to avoid creditors' collection efforts and that he regarded the payments to Ole Brook Energy's creditors a matter of goodwill, not an obligation. The evidence also showed that Ole Brook Energy did not receive value or reasonably equivalent value in exchange for the transfer. And, although the transfer did not precede the incurring of new debt, it did precede the obligations assumed under the settlement agreement. That is, Ole Brook Energy agreed to a repayment plan in the settlement agreement at a time when it had no charter to operate in Texas and no equipment with which to perform its work. Considering all

of the evidence together, there was evidence of actual intent to hinder, delay, or defraud.

The appellants argue that the evidence was legally insufficient because the statutory factors used to show actual intent were outweighed by evidence of payments to creditors, just as in both *Texas Custom Pools, Inc. v. Clayton*, 293 S.W.3d 299 (Tex. App.—El Paso 2009, order [mand. denied]), and *Van Slyke v. Teel Holdings, LLC*, No. 01-08-00600-CV, 2010 WL 2788876 (Tex. App.—Houston [1st Dist.] July 15, 2010, no pet.) (mem. op.). This is not a proper challenge to the sufficiency of the evidence because we do not weigh the evidence in a legal-sufficiency review. *See City of Keller*, 168 S.W.3d at 820. The courts in *Clayton* and *Van Slyke* did not hold that evidence of subsequent payment of creditors negates evidence of intent to defraud. Instead, these cases stand for the proposition that determining actual intent is fact-specific and requires consideration of the evidence, not mere counting of factors. *See Clayton*, 293 S.W.3d at 311; *Van Slyke*, 2010 WL 2788876, at *5–6; *see also Williams v. Houston Plants & Garden World, Inc.*, Civil Action No. H-11-2545, 2014 WL 3665764, at *7 (S.D. Tex. July 22, 2014) (noting that *Van Slyke* depended heavily on its facts).

In *Clayton* and *Van Slyke* the contested transfers were made directly to creditors. In contrast, the contested transfers at issue in this appeal were to a company that was wholly owned and controlled by an insider, the sole owner of the

23

debtor company. There was evidence that an insider benefited personally from the transfer by using a truck previously owned by Ole Brook Energy and giving another vehicle to his daughter. In this case, the vast majority of the badges of fraud were present, and the evidence of actual intent was strong. In light of both our standard of review and our review of the statutory factors, we hold that the evidence was legally sufficient to support a finding of actual intent.

### 2. Factual sufficiency

Jones and OBES argue that the evidence was factually insufficient to support the jury's finding of actual intent because the payments made to creditors exceeded the value of the assets transferred. This is similar to the argument made regarding legal sufficiency. Our factual sufficiency review requires us to view all of the evidence in a neutral light, while still restricting us from second-guessing the factfinder's credibility determinations. *See Cain*, 709 S.W.2d at 176; *Nelson*, 127 S.W.3d at 174.

To succeed on a factual sufficiency challenge, Jones and OBES had to show that a finding of actual intent was against the great weight and preponderance of the evidence. *See Cain*, 709 S.W.2d at 176. The evidence of debt-repayment consisted of Jones's testimony and lists of payments printed from accounting records. The payment history was not supported by evidence of the actual debts or the payments, such as a promissory note, canceled check, or bank statement. More importantly,

24

even if the jury believed that OBES made all the payments described in his testimony, that was not inconsistent with a finding of actual intent to defraud. The evidence supported findings of most of the statutory badges of fraud. We conclude that the jury's finding of actual intent was not against the great weight and preponderance of the evidence.

## B.    Statute of repose

Jones and OBES contend that the evidence was legally and factually insufficient to support the jury's finding that Dyna Drill filed its claims within one year after it discovered or reasonably could have discovered that Ole Brook Energy had fraudulently transferred the property listed in the bills of sale. They assert that Dyna Drill filed its fraudulent-transfer claims more than four years after the transfer and more than one year after it reasonably could have discovered the transfer. They rely on evidence that Dyna Drill received payments from a different company at a different address than the one listed in the settlement agreement. They also rely on public records showing that Ole Brook Energy's charter had been forfeited. They maintain that this evidence put Dyna Drill on notice of facts that would have led to the discovery of its claim if it had exercised reasonable diligence.

The statute of repose extinguishes actual-intent fraudulent-transfer claims unless brought "within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could

25

reasonably have been discovered by the claimant." TEX. BUS. & COM. CODE § 24.010(a)(1). When determining whether the discovery rule embodied in this statute applies, Texas courts apply the rules developed under the common law. *See Zenner v. Lone Star Striping & Paving, L.L.C.*, 371 S.W.3d 311, 315 (Tex. App.— Houston [1st Dist.] 2012, pet. denied). Whether a fraudulent-transfer claim has been extinguished by the statute of repose ordinarily presents a question of fact for the factfinder to resolve. *See Ryland Grp., Inc. v. Hood*, 924 S.W.2d 120, 121 (Tex. 1996) (per curiam); *Walker v. Anderson*, 232 S.W.3d 899, 910 (Tex. App.—Dallas 2007, no pet.); *see also Hooks v. Samson Lone Star, LP*, 457 S.W.3d 52, 58 (Tex. 2015) ("reasonable diligence is an issue of fact").

The statute of repose is an affirmative defense on which the defendant has the burden of proof on all elements. *Ryland Grp.*, 924 S.W.2d at 121. Thus, a defendant pleading that a claim has been extinguished by the statute of repose has the burden to prove when the transfer was or reasonably could have been discovered.

The fraudulent transfers were made in June and October 2010. The parties stipulated that Dyna Drill filed suit against Jones in October 2014, and it filed suit against OBES on June 5, 2015. Jones's deposition was taken on October 6, 2015. The jury was asked:

> Did Dyna Drill file its fraudulent transfer claim against OBES, Inc. within one year after Dyna Drill did discover or could reasonably have discovered that Ole Brook Energy Services, Inc. had transferred the

26

property listed on the June 10, 2010 Bill of Sale and the October 15, 2010 Bill of Sale to OBES?

The payments to Dyna Drill were made by checks from "Ole Brook Directional Services" with a memo line identifying "Olebrook Energy Acc't." This evidence could have suggested that the payments were being made by a business entity other than the particular entity that had been Dyna Drill's contractual counterparty. But Jones and OBES do not explain how this evidence conclusively shows that Dyna Drill was put on notice of a fraudulent transfer. The evidence did not suggest a transfer of assets without an accompanying transfer of obligations. Similarly, Jones and OBES do not explain why the forfeiture of Ole Brook Energy's charter, which was a matter of public record, put Dyna Drill on notice of a fraudulent transfer of assets.

At trial Jones testified that he did not inform Dyna Drill about the transfers prior to his deposition, which took place in October 2015. He said: "That's when I was asked." He had no knowledge of anyone telling Dyna Drill about the asset transfers before his deposition. Moreover, Jones was the sole owner of both entities, and the record does not demonstrate that anyone else had knowledge of the asset transfers when they were made. Finally, the jury's finding that Dyna Drill filed suit within one year of when it did discover or reasonably could have discovered the fraudulent transfer was supported by Braxton's testimony that Dyna Drill first

learned of the existence of OBES in 2015, and that it would have sued that entity earlier if it had known of its existence and activities.

Based on the evidence at trial, the jury reasonably could have concluded that Dyna Drill filed suit against Jones and OBES within one year after it "did discover or reasonably could have discovered" the asset transfers. We hold that the evidence is legally and factually sufficient to support that determination. *See City of Keller*, 168 S.W.3d at 822; *Cain*, 709 S.W.2d at 176.

## II. Attorney's fees

In their third issue, Jones and OBES argue that the trial court abused its discretion because the attorney's fees award was not equitable and just and because Dyna Drill did not segregate its fees by cause of action.

### A. Equitable and just standard

The appellants contend that the award of attorney's fees was not equitable and just because there was overwhelming evidence that they made payments to Ole Brook Energy's creditors.

Under the fraudulent-transfer statute, the court "may award costs and reasonable attorney's fees as are equitable and just." TEX. BUS. & COM. CODE § 24.013. We review a trial court's award of attorney's fees for an abuse of discretion. *See Bocquet v. Herring*, 972 S.W.2d 19, 20–21 (Tex. 1998); *Walker*, 232 S.W.3d at 919. A district court abuses its discretion if it acts without reference to

28

any guiding principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). To determine whether a district court abused its discretion, we consider whether its action was arbitrary or unreasonable. *Id.* at 242.

Jones and OBES provide no legal authority for the proposition that payments to third parties who are strangers to the lawsuit should exempt them from liability for Dyna Drill's legal fees. Dyna Drill successfully prosecuted its fraudulent transfer claims. The law provides a legal remedy in these circumstances, and an award of attorney's fees for successfully proving the claim was not inequitable or unjust. *See Esse v. Empire Energy III, Ltd.*, 333 S.W.3d 166, 183 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (holding that trustee was entitled to legal fees for successfully prosecuting a fraudulent transfer claim).

## B.     Segregation of fees

Jones and OBES contend that Dyna Drill did not properly segregate its attorney's fees for the fraudulent-transfer claims from the Tax Code claims that ultimately were abandoned before trial. Initially, Dyna Drill sought approximately $74,000 in attorney's fees and expenses. The appellants raised several objections and challenges to the motion for attorney's fees, which were discussed in some detail at a hearing. The trial court allowed the fees for the original petition filed in October 2014, which included a fraudulent-transfer claim against Jones.

29

Parties seeking attorney's fees under Texas law "have always been required to segregate fees between claims for which they are recoverable and claims for which they are not." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 311 (Tex. 2006). Attorney's fees that relate solely to a claim for which fees are unrecoverable must be segregated. *Id.* at 313. "An exception exists only when the fees are based on claims arising out of the same transaction that are so intertwined and inseparable as to make segregation impossible." *Kinsel v. Lindsey*, 526 S.W.3d 411, 427 (Tex. 2017). "[I]t is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated." *Chapa*, 212 S.W.3d at 313–14. In *Chapa*, the Court observed:

> Many of the services involved in preparing a contract or DTPA claim for trial must still be incurred if tort claims are appended to it; adding the latter claims does not render the former services unrecoverable. Requests for standard disclosures, proof of background facts, depositions of the primary actors, discovery motions and hearings, *voir dire* of the jury, and a host of other services may be necessary whether a claim is filed alone or with others. To the extent such services would have been incurred on a recoverable claim alone, they are not disallowed simply because they do double service.

*Id.* at 313.

After the jury verdict in its favor, Dyna Drill filed a motion for attorney's fees. Among the evidence attached to its motion were: an affidavit from its attorney, Blake Hamm; a summary of the fees charged in the case; a summary of the expenses; and unredacted invoices that corresponded to the summary of charges. Jones and OBES

30

filed a response with an affidavit from their attorney, Andrew Lemanski, challenging the reasonableness of the fees.

At the hearing on the motion for attorney's fees, Dyna Drill waived its entire request for expenses, which amounted to $2,000. Dyna Drill agreed to reduce its fee request on several line items that the appellants had challenged as unreasonable. It reduced the time billed for a scheduling order. It waived the fees billed for drafting a garnishment and an emergency motion to compel, both of which were never filed. It reduced the time spent responding to a motion for summary judgment. It wrote down charges for work related to the Johnson County matter. In all, Dyna Drill agreed to waive approximately $14,000 in fees and expenses.

Lemanski raised the issue of fee segregation, identifying a billing-record entry that stated: "Analyze case law regarding tax code claim." Dyna Drill agreed to waive its request for the $487.50 charged for that reason. The court asked Lemanski, "Anything else on fees?" He responded, "No, Your Honor, other than, of course, the availability. But in terms of the amount, no."

Jones and OBES filed a motion for new trial arguing, among other things, that the court erred by not requiring Dyna Drill to segregate attorney's fees for the Tax Code claim. As an example, they referred to the same entry in the billing records which Dyna Drill already had agreed to waive. Without citation to the record or authority, Jones and OBES argued: "Unless Plaintiff's counsel spent all the time

31

claimed pursuing a theory they had no evidence of at the time, at least a portion of this time was surely due to work on the tax code claim." No specific entries were identified as relating only to the Tax Code claim.

On appeal, Dyna Drill contends that it did segregate its fees, referring to the entry expressly mentioning the Tax Code claim. This complied with *Chapa*'s directive to segregate fees that relate solely to a claim for which fees are unrecoverable. *See id.* at 313.

The original petition included a fraudulent-transfer claim against Jones, and the subsequent petitions alleged a fraudulent-transfer claim against OBES as well. The second amended petition dropped the Tax Code allegations. Although Dyna Drill originally pleaded for relief under both the Tax Code and the fraudulent-transfer statute, those allegations were two alternative ways to impose liability on Jones or OBES for the unpaid debt of Ole Brook Energy. The billing records that were attached to Dyna Drill's motion for attorney's fees show that various services were billed during the time period from October 2014 to October 2015 when the Tax Code claim remained pending: propounding and responding to discovery requests; reviewing pleadings and responses from Jones and OBES; communication with the court, client, and opposing counsel; and scheduling and preparing for Jones's deposition. These are the kinds of services that were necessary

whether the fraudulent-transfer claim had been filed alone or with the Tax Code claim. *See id.*

Dyna Drill's billing records did segregate services that pertained only to the Tax Code claim. The appellants have not shown that any of the other entries were capable of further segregation because they pertained only to the Tax Code claim.

## Conclusion

We affirm the judgment of the trial court.

Michael Massengale
Justice

Panel consists of Justices Keyes, Bland, and Massengale.