**Appellants' Motion Granted in Part and Denied in Part; Appellee's Motion Denied; Appellee's Motion to Lift Stay Dismissed as Moot; and Opinion filed July 12, 2022.**



In The

# Fourteenth Court of Appeals

_____

## NO. 14-21-00701-CV
_____

### AMERICAN AKAUSHI ASSOCIATION, INC., HEARTBRAND HOLDINGS, INC., AND RONALD BEEMAN, Appellants/Cross-Appellees

### V.

### TWINWOOD CATTLE COMPANY, INC., Appellee/Cross-Appellant

**On Appeal from the 458th District Court**
**Fort Bend County, Texas**
**Trial Court Cause No. 18-DCV-250789**

## OPINION ON MOTIONS

Appellants and cross-appellees HeartBrand Holdings, Inc. ("HeartBrand"), American Akaushi Association ("AAA"), and Ronald Beeman (collectively "Appellants") filed a motion to review the trial court's net worth determination in connection with supersedeas of the judgment. *See* Tex. R. App. P. 24.4. Appellee and cross-appellant, Twinwood Cattle Company, Inc. ("Twinwood"), filed its own

motion for review. Appellants argue the trial court set the supersedeas bond amount too high. Twinwood, on the other hand, contends the court acted within its discretion and, if any change is warranted, the bond amount should be increased. On the parties' agreement, this court issued an order staying execution of the judgment pending disposition of the motions. We grant in part and deny in part Appellants' motion, we deny Twinwood's motion, and we modify the supersedeas bond amount required to continue suspension of the judgment's execution. We lift our February 16, 2022 stay order.[1] Because our order requires HeartBrand to file additional security in the trial court, enforcement of the judgment is suspended for twenty days from today's date. Tex. R. App. P. 24.4(e).

## Background

The underlying dispute arises from Twinwood's breach of contract and fraud claims in connection with AAA's obligation to procure and provide DNA parent verified pedigrees on Twinwood's Akaushi cattle registered with the AAA. A jury found in favor of Twinwood and against AAA, HeartBrand, and Beeman. As to AAA, the jury found that it breached its contractual obligations to Twinwood and committed fraud. The jury also found that AAA, HeartBrand, and Beeman were part of a conspiracy that damaged Twinwood. Additionally, it found that HeartBrand is responsible for AAA's conduct under alter ego principles.

The trial court signed a final judgment on September 17, 2021. The amount of compensatory damages, interest for the estimated duration of the appeal, and costs, total $20,454,863. Absent modification by the court or application of the bond

---

[1] We dismiss as moot Twinwood's Motion to Lift Stay of Execution of Judgment filed June 10, 2022.

2

caps, this is the amount of security required to supersede the judgment pending appeal. *See* Tex. R. App. P. 24.2(a)(1).

After the verdict but before judgment, HeartBrand distributed $1.5 million in dividends to shareholders and purchased the shares of three shareholders for $875,000. Based on these actions, Twinwood filed an application for a temporary injunction. In an October 19, 2021 order, the court enjoined HeartBrand and those acting in concert with it "from (1) making any further distributions to shareholders, and (2) otherwise distributing cash and other assets, or liquidating assets, outside the legitimate normal course of business so as to avoid satisfaction" of the judgment.

On November 10, 2021, HeartBrand and AAA tendered a joint supersedeas bond of $6,708,083.90, represented to be fifty percent of HeartBrand's net worth of $13,416,167.80 based on a consolidated balance sheet and an affidavit from its controller, certified public accountant Carol Brown. Twinwood filed a net worth contest the following day. *See* Tex. R. App. P. 24.2(c)(2). Only HeartBrand's net worth is in dispute.[2]

After conducting a three-day evidentiary hearing on Twinwood's contest, the trial court signed an order sustaining the contest (the "Order"). Among other things, the court found that the $6,708,183.90 supersedeas bond tendered by HeartBrand was insufficient; that HeartBrand's net worth evidence was not complete, credible, or reliable; and that Twinwood's evidence was credible and reliable. Three additional findings in particular form the bases of the parties' competing motions before us. First, the court found that a $20 million promissory note between the Beemans and HeartBrand and shown on the balance sheet was not a liability at all

---

[2] The trial court found AAA's net worth to be negative, and Beeman filed a cash deposit in lieu of bond. Twinwood challenges neither matter.

3

but should be treated as invested capital rather than debt. The court stated the following reasons for its finding:

> The Court concludes that the $20,000,000 promissory note between the Beemans and HeartBrand appropriately should be characterized as invested capital rather than debt. This note was not the result of an arm's length negotiation; it is a related party transaction to benefit the Beemans. The Beeman family members are beneficiaries of payments on that account, and they control HeartBrand as shareholders, managers, directors, and officers. Ronald Beeman extended the initial line of credit to HeartBrand in 2001 because no bank would offer the same terms. HeartBrand was heavily undercapitalized before infusions from the majority shareholder Beeman family. HeartBrand has no real intent to pay down the debt, which grew from approximately $780,000 in 2011 to more than $24,000,000 in four years making no principal payments. HeartBrand elected to pay shareholder dividends rather than pay down this note. HeartBrand has treated the line of credit and resulting promissory note as a capital contribution to expand the business, not to be repaid. There is no limit to the line of credit, and the beneficiaries of the note have been allowed to draw upon it at HeartBrand's expense unchecked. HeartBrand and the Beemans changed the interest rate at will, which has varied from .25% to 2.91% to 4%. Before the terms were modified in August 2018, there was no maturity date and the principal sum at that time was $20,000,000. HeartBrand currently is required only to pay interest and is paying only interest on the advance and does not have a plan on how to pay the principal balance at maturity in 2028.

The second and third topics on which the parties join issue relate to the $1.5 million dividend distribution and the $875,000 share purchase. The court disregarded those transactions as efforts to reduce net worth after the verdict. The court stated, "[b]ut for those distributions and purchases, there would be additional assets on the HeartBrand balance sheet."

Based on its findings, the court reduced HeartBrand's liabilities by $20 million and increased HeartBrand's assets by $2,375,000 ($1,500,000 plus $875,000). Accounting for these modifications to HeartBrand's original claimed net

worth of $13,416,168, the court found HeartBrand's net worth for supersedeas bond purposes to be $35,791,168. Applying rule 24.2's fifty-percent net worth bond cap, the court ordered HeartBrand to file $17,895,584 in security to supersede the judgment.

The court also made conditional findings "if a net worth computation is undertaken" on appeal based on the "fair value of assets" rather than book value. Under that alternative valuation approach, the court found HeartBrand's net worth was no less than $65,471,804.

In their motion for review, Appellants ask us to vacate the trial court's net worth findings and direct the district clerk to approve HeartBrand's and AAA's joint supersedeas bond in the amount of $6,708,183.90. Appellants raise various legal and factual sufficiency challenges to the findings. Twinwood, on the other hand, asks us to increase the bond amount to $20,454,863, the default amount required under rule 24.2(a)(1) without application of the net worth caps. Should we deny that relief, Twinwood urges us to uphold the trial court's order. We stayed enforcement of the judgment pending our review of the parties' motions.

## Analysis

### A.    Applicable Standards

A judgment debtor may supersede the judgment by: (1) filing with the trial court clerk a written agreement with the judgment creditor for suspending enforcement of the judgment; (2) filing with the trial court clerk a good and sufficient bond; (3) making a deposit with the trial court clerk in lieu of a bond; or (4) providing alternate security ordered by the court. Tex. R. App. P. 24.1(a). The amount of security necessary to supersede a money judgment must equal the sum of: (1) the amount of compensatory damages awarded in the judgment; (2) interest for the

5

estimated duration of the appeal; and (3) costs awarded in the judgment. Tex. R. App. P. 24.2(a)(1); Tex. Civ. Prac. & Rem. Code Ann. § 52.006(a). The amount of security may not, however, exceed the lesser of (1) fifty percent of the judgment debtor's net worth or (2) $25 million. Tex. R. App. P. 24.2(a)(1)(A), (B); Tex. Civ. Prac. & Rem. Code Ann. § 52.006(b)(1), (2).

A judgment debtor who provides a bond or deposit based on net worth simultaneously must file an affidavit that states the debtor's net worth and states complete, detailed information concerning the debtor's assets and liabilities from which net worth can be ascertained. Tex. R. App. P. 24.2(c)(1). A judgment creditor may file a contest to the debtor's claimed net worth and may conduct reasonable discovery concerning net worth. Tex. R. App. P. 24.2(c)(2).

Following discovery, the trial court must hold a hearing on the contest. Tex. R. App. P. 24.2(c)(3). The judgment debtor bears the burden to prove net worth. *Id.* The trial court must issue an order that states each judgment debtor's net worth and states with particularity the factual basis for that determination. *Id.*; *In re Smith*, 192 S.W.3d 564, 566 (Tex. 2006) (orig. proceeding) (per curiam). For supersedeas purposes, net worth is the difference between total assets and total liabilities as determined by generally accepted accounting principles. *Texas Black Iron, Inc. v. N. Am. Interpipe, Inc.*, No. 14-20-00068-CV, 2020 WL 10231117, at *2 (Tex. App.—Houston [14th Dist.] July 28, 2020, mem. op. on motion), *dismissed on motion*, 2022 WL 97662 (Tex. App.—Houston [14th Dist.] Jan. 11, 2022); *O.C.T.G., L.L.P. v. Laguna Tubular Prods. Corp.*, 525 S.W.3d 822, 830 (Tex. App.—Houston [14th Dist.] 2017, op. on motion); *LMC Complete Auto., Inc. v. Burke*, 229 S.W.3d 469, 482 (Tex. App.—Houston [1st Dist.] 2007, pet. denied); *Ramco Oil & Gas, Ltd.*

6

*v. Anglo Dutch (Tenge) L.L.C.*, 171 S.W.3d 905, 914 (Tex. App.—Houston [14th Dist.] 2005, no pet.).[3]

On the motion of a party, an appellate court may review the sufficiency or excessiveness of the amount of security. *See* Tex. R. App. P. 24.4(a)(1). We review the trial court's determination of the amount of security for an abuse of discretion. *Texas Black Iron*, 2020 WL 10231117, at \*2; *Ramco*, 171 S.W.3d at 909. Generally, the test for abuse of discretion is whether the trial court acted without reference to any guiding rules and principles or whether the trial court acted arbitrarily and unreasonably. *Texas Black Iron*, 2020 WL 10231117, at \*2 (citing *McDaniel v. Yarbrough*, 898 S.W.2d 251, 253 (Tex. 1995)). The trial court abuses its discretion if the evidence is legally or factually insufficient to support its findings. *See In re Smith*, 192 S.W.3d at 570; *Ramco*, 171 S.W.3d at 910.

We apply traditional evidentiary sufficiency standards of review to legal and factual sufficiency challenges in this context. *Texas Black Iron*, 2020 WL 10231117, at \*2. For legal sufficiency challenges, we consider all of the evidence

---

[3] We disagree with Twinwood that the First Court of Appeals deviated from this formulation in *EnviroPower, L.L.C. v. Bear, Stearns & Co., Inc.*, 265 S.W.3d 1 (Tex. App.—Houston [1st Dist.] 2008, en banc order). Quoting *EnviroPower*, Twinwood says the correct measure of a company's net worth is the company's "current assets minus current liabilities at the time the bond is set." *Id.* at 5. Twinwood reads this statement as holding that only "current assets" and "current liabilities", in the financial accounting sense, are considered in calculating, as rule 24 puts it, "current net worth." And, Twinwood continues, one reason the trial court correctly declined to count the $20 million note as a liability in the net worth calculation was because it is shown on the balance sheet as a "long term" note payable rather than as a "current liability." A reading of the entire *EnviroPower* opinion in context, however, shows that the en banc court adopted the traditional net worth definition as "the difference between total assets and total liabilities as determined by generally accepted accounting principles." *Id.* at 5. Moreover, given that the *EnviroPower* court was citing to, and quoting from, cases such as *LMC Complete Automotive*, *Ramco*, and *G.M. Houser, Inc. v. Rodgers*, 204 S.W.3d 836, 840 (Tex. App.—Dallas 2006, no pet.), we do not construe it as deviating from the uniform net worth formulation adopted by those cases and every Texas appellate court that has considered the question. Rule 24.2's reference to "current" net worth means net worth at the time the bond is set.

in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *Id*. We must credit favorable evidence if a reasonable fact finder could and disregard contrary evidence unless a reasonable fact finder could not. *Id*. Finally, we must determine whether the evidence before the court would allow reasonable and fair-minded people to find the facts at issue. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005); *Ramco*, 171 S.W.3d at 910.

When the issue is factual sufficiency, we examine the entire record, considering the evidence both in favor of and contrary to the challenged finding. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam); *Ramco*, 171 S.W.3d at 910. We set aside the fact finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Pool v. Ford Motor Co*., 715 S.W.2d 629, 635 (Tex. 1986); *Ramco*, 171 S.W.3d at 910.

Because the judgment debtor has the burden to prove net worth, prevailing on a legal insufficiency point on appeal requires the debtor to show that the evidence conclusively establishes, as a matter of law, all vital facts in support of its position. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001); *Texas Black Iron*, 2020 WL 10231117, at *3; *Ramco*, 171 S.W.3d at 910. Testimony from interested witnesses may establish a fact as a matter of law only if the testimony could be readily contradicted if untrue, and is clear, direct, and positive, and there are no circumstances tending to discredit or impeach it. *Lofton v. Tex. Brine Corp.*, 777 S.W.2d 384, 386 (Tex.1989); *see also City of Keller*, 168 S.W.3d at 820.

In conducting legal and factual sufficiency review, we remain mindful that the trial court, as fact finder, is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *City of Keller*, 168 S.W.3d at 819; *O.C.T.G., L.L.P.*, 525 S.W.3d at 831; *Ramco*, 171 S.W.3d at 910. This includes experts. When presented with more than one expert, the trial court is permitted to credit one over

the other. *Texas Black Iron*, 2020 WL 10231117, at *8 (citing *Gunn v. McCoy*, 554 S.W.3d 645, 665 (Tex. 2018)). We may not substitute our judgment for the fact finder's, even if we would reach a different answer on the evidence. *LMC Complete Auto.*, 229 S.W.3d at 475.

## B. Evidence

Appellants presented the live testimony of three witnesses, Carol Brown, Ronald Beeman, and William Kothman. Twinwood presented Bruce Arendale. The court also considered deposition excerpts of several witnesses. The court admitted into evidence seventy-two documentary exhibits.

### 1. *Promissory note*

The court heard substantial evidence about the $20 million promissory note. We first summarize the evidence Appellants presented. Under a December 2011 letter agreement, Beeman provided a line of credit for HeartBrand's operating expenses to be drawn on as necessary. HeartBrand would owe 4% interest, a rate to be reviewed upon renewal. The line of credit would be renewed annually unless terminated. Beginning in late 2011, HeartBrand drew on the line of credit to cover operating expenses, including cattle purchases, feed purchases, and services like insurance and legal representation. HeartBrand's controller, Carol Brown, testified that she would draw on the line of credit as needed, record the draws, calculate interest, and pay the resulting interest when due.

HeartBrand's 2012 and 2013 audited financial statements identified the note as a debt and included it on the balance sheet as a liability. HeartBrand's outside auditors opined that these financial statements were fairly presented in accordance with generally accepted accounting principles. The line of credit was later modified pursuant to an August 2014 "Loan Modification Agreement," which renewed the

9

line-of-credit arrangement as a "line of credit promissory note." The amendment was adopted in conjunction with the reorganization of HeartBrand's operating subsidiaries, a reorganization HeartBrand undertook to better organize and track the operations of its different business activities, including live cattle sales, cattle feeding, and meat sales. The Loan Modification Agreement was accompanied by a written security agreement pledging the assets of HeartBrand and its new subsidiaries as collateral for the note. Lawyers filed UCC financing statements documenting Beeman's security interest with the Texas Secretary of State's office. The Loan Modification Agreement acknowledged that the note's outstanding principal balance as of the agreement's effective date was $17,326,635.86.

HeartBrand continued to take advances and make principal payments under the note from time to time, and paid interest monthly. In November 2015, the note reached its highest balance: $24,850,396.73. From that point forward, HeartBrand took only one more advance on the note, and began gradually paying down the note balance as the company began to achieve profitability. In 2018, the line of credit was again modified by a written agreement, which established a new 2028 maturity date, changed the annual interest rate to 2.91%, and noted an outstanding principal balance of $20,000,000.[4] The remaining unpaid line of credit balance above $20 million ($1,367,500) was paid back to Ronald and Joan Beeman over the next eight months.

Beginning in fiscal year 2019, HeartBrand began obtaining financial statement review services from accounting firm RSM US LLP. The 2019 and 2020 financial statements again identified the note as a debt and included it on the balance

---

[4] According to Appellants, the 2018 modification occurred in conjunction with the Beemans' estate planning activity. Shortly after the modification, Ronald and his wife, Joan, assigned a 60% interest in the note to four trusts (benefiting their son and grandchildren). Ronald and Joan still hold the remaining 40% interest in the note.

sheet as a liability. RSM accountants concluded that there were no material restatements required to bring the financial statements into conformance with generally accepted accounting principles. HeartBrand reported the note balance and interest payments on its federal income tax returns. Ronald and Joan Beeman reported the note interest from HeartBrand as income on their federal income tax returns.

Ronald Beeman and Carol Brown testified that the note is a debt, that it has always been treated as a debt, and that it is intended that the debt will be repaid according to its terms.

Twinwood's evidence regarding the note differed from Appellants' in several respects. HeartBrand owed a large amount of money and was near bankruptcy when the Beemans took over. Ronald Beeman initially asked a bank for traditional financing but was refused. Ronald and Joan Beeman had to personally provide the money to continue HeartBrand's operations, and access to a line of credit was helpful to HeartBrand's growth. The note provided for an interest rate very favorable to HeartBrand. One of the board members, Bill Fielding, testified that he did not recall any discussions or a vote of the board in connection with the note's execution. He did not recall ever being apprised of the note's details. He believed it unlikely that HeartBrand could have obtained a line of credit from a bank.

All parties have acknowledged that the note is a related party transaction. The original note was signed by Brown on behalf of HeartBrand and by Ronald Beeman on behalf of Beeman Ranch. Beeman Ranch is Ronald and Joan Beeman's personal ranching operation. Later iterations of the note were signed by Jordan and Ronald Beeman. Beeman family members are beneficiaries of the note, including interest payments. The note was amended in 2018 to accommodate Beeman family estate planning and a gift of part of the note to Jordan Beeman and his children, with $20

11

million still owed to the Beeman family. The Beeman family owns most of the shares of HeartBrand. Ronald Beeman is chairman of the board; and Jordan Beeman is president. HeartBrand is paying the Beemans $48,500 per month on the note, which adds up to $582,000 per year. HeartBrand shareholders are beneficiaries of the note payments.

Liability on the note grew from approximately $780,000 in 2011 to more than $24,000,000 four years later. During that time, HeartBrand made limited principal payments. There was no limit to the line of credit until recently—Brown said there was no need for one—and Brown has authority to draw on it when there is not enough cash in the bank. Before the terms were modified in August 2018, there was no maturity date. HeartBrand has paid no principal since modification in 2018. Brown testified that HeartBrand has not discussed how to pay down the principal; Jordan Beeman has never discussed with Brown a plan to pay down the principal; and Fielding was not aware of any intent to pay down the principal. Ronald Beeman has never asked HeartBrand to repay the line of credit. Ronald Beeman said there could be a balloon payment or a refinancing in 2028 upon maturity.

HeartBrand and the Beemans modified the interest rate over time, which has varied from 4% to .25% to 2.91%. HeartBrand always paid interest and never has been required to pay down principal. HeartBrand elected to pay shareholder dividends in 2021 rather than pay down the note.

2. *Dividend distribution*

The $1.5 million dividend payment was paid to all shareholders, including forty-one shareholders outside the Beeman family who hold nearly 30% of the company's stock. HeartBrand also paid dividends to stockholders in 2020, though it had not paid any dividends in the preceding fourteen years. According to Jordan Beeman, HeartBrand decided to distribute dividends because HeartBrand had "good

12

years" in 2020 and 2021 and wanted to return those proceeds to shareholders. Most of the shares are owned by Beeman family members. HeartBrand's external accountant was unaware of the dividend payments but would have expected to be made aware of them if they occurred.

### 3. *Share purchase*

According to Beeman, the purchase of shares was initiated by three shareholders, who were early investors in the company and are not related to the Beeman family. These investors requested their money back, in one instance to pay medical bills.

## C. Appellants' motion

### 1. *The court's credibility and completeness findings*

In their first argument, Appellants challenge the court's credibility findings, as well as the finding that Appellants failed to "provide[] complete, detailed information concerning assets and liabilities from which net worth can be ascertained." Appellants contend these findings either are unsupported or inconsistent with the court's ultimate conclusions.

The trial court is the sole judge of witness credibility, and Appellants have not presented any basis on which we may disregard the court's determinations that Appellants' witnesses were not credible and that Twinwood's witnesses were credible. Appellants suggest that, because the court used Appellants' balance sheet as a starting point for the net worth calculation, it plainly accepted their evidence. We agree the court accepted some of Appellants' evidence; but the court rejected other portions, as was its prerogative. *See Texas Black Iron*, 2020 WL 10231117, at *2, *8; *White v. Pottorff*, No. 05-14-00675-CV, 2015 WL 302810, at *5 (Tex. App.—Dallas Jan. 23, 2015, mem. op. on motion). The court was within its authority

13

to find that Appellants' evidence lacked the completeness, detail, and consistency necessary to support HeartBrand's alleged net worth, even though the court accepted some of Appellants' proof. The court's challenged findings are not inconsistent or unsupported for the reasons Appellants contend.

### 2. *The $20 million promissory note*

Next, Appellants argue that the $20 million note between HeartBrand and the Beemans is a related-party debt that must be included as a liability in the net worth calculation. They say the court's contrary finding disregarding the debt and treating it as capital is an error of law and unsupported by legally or factually sufficient evidence.

According to Appellants, a trial court may not disregard related-party or affiliate debts, as least so long as those debts are genuinely based on value the judgment debtor received from the affiliate, as they say this note was. Appellants cite *O.C.T.G.* and *Texas Custom Pools, Inc. v. Clayton*, 293 S.W.3d 299 (Tex. App.—El Paso 2009, orig. proceeding). In *O.C.T.G.*, this court examined whether the trial court erred in excluding from O.C.T.G.'s net worth calculation liabilities it owed to companies with common ownership. 525 S.W.3d at 827, 830. The judgment creditor argued that GAAP required O.C.T.G. to consolidate its financial statement with its affiliates and use eliminating journal entries because liabilities owed to other commonly owned companies were not "real debts." *Id*. at 830. We disagreed because Texas law requires the net worth of each judgment debtor to be determined separately. *Id*. (citing *In re Smith*, 192 S.W.3d at 568-69). We held that, absent an alter ego finding, a court abuses its discretion by using a consolidated financial statement to determine a judgment debtor's net worth. *Id*.

In *Texas Custom Pools*, the Eighth Court of Appeals examined whether amounts owed under an agreement providing for certain bonus compensation for a

14

company's two shareholders was properly counted as a liability on the company's balance sheet for net worth purposes. 293 S.W.3d at 307. Due to cash flow issues, the bonus compensation was not paid each year, and the company showed the amounts owed on its books as a liability. *Id*. The trial court excluded the amounts payable from its net worth calculation. *Id*. at 308. The trial court did not state the basis for doing so, but the parties' arguments on appeal focused on whether the compensation agreement was valid. The court of appeals held it was valid and thus the trial court erred in failing to treat the amounts due to the shareholders under the compensation agreement as liabilities. *Id*. at 310.

Based on these cases, Appellants argue that the trial court abused its discretion in disregarding the promissory note as a liability "merely because it is owed to a related party." But the trial court did not disregard the $20 million note merely because it is owed to a shareholder. Rather, it treated the note as capital based on several circumstances over time indicating that the note bore the characteristics of capital rather than a liability. Additionally, neither *O.C.T.G.* nor *Texas Custom Pools* stand for the proposition that related-party debts must always be characterized as liabilities as a matter of law in calculating a company's net worth. The court in *Texas Custom Pools* merely concluded that no evidence supported the trial court's decision, not that the court lacked discretion to disregard the purported debt if credible evidence indicated that it was not actually treated as a debt.

Further, Appellants criticize Twinwood's reliance on a multi-factor test courts have long used in tax and bankruptcy cases to distinguish between debt and equity. *See In re Lothian Oil Inc.*, 650 F.3d 539, 544 (5th Cir. 2011); *Fin Hay Realty Co. v. United States*, 398 F.2d 694, 696 (3d Cir. 1968) (listing such criteria as "the intent of the parties," "the identity between creditors and shareholders," "the extent of participation in management by the holder of the instrument," "the ability of the

15

corporation to obtain funds from outside sources," "the voting power of the holder of the instrument," "the provision of a fixed rate of interest," and "the presence or absence of a fixed maturity date" as affecting the distinction between debt and equity). At least one Texas court has referred to these factors in a franchise tax case. *Arch Petroleum, Inc. v. Sharp*, 958 S.W.2d 475, 477 n.3 (Tex. App.—Austin 1997, no pet.).[5] The parties presented evidence bearing on these factors, and the trial court made findings on them. Noting that such a test has never been utilized in Texas to recharacterize or disregard a liability for net worth purposes, Appellants say those factors are irrelevant.

We disagree with Appellants that the trial court lacked discretion to find that the $20 million promissory note is appropriately considered as invested capital rather than a liability. Under rule 24.2, courts assessing a judgment debtor's net worth have authority to determine assets and liabilities because they must ascertain net worth from that information. The trial court is obligated to find the judgment debtor's net worth, and to state with particularity the reasons for its finding. Tex. R. App. P. 24.2(c)(3); *In re Smith*, 192 S.W.3d at 568. Thus, whether a liability shown on a judgment debtor's balance sheet is or is not a debt for net worth purposes is a matter well within a trial court's fact-finding function. The same is true for asset valuation. *See White*, 2015 WL 302810, at *5; *LMC Complete Auto.*, 229 S.W.3d at 486. The trial court determines what the assets and liabilities are. The court is free to credit one expert over another, or one witness over another, in performing this duty. *Texas Black Iron, Inc.*, 2020 WL 10231117, at *8. For these reasons, we conclude that evidence bearing on whether the note is a liability is relevant and the

---

[5] *Arch Petroleum* involved whether to characterize convertible redeemable preferred stock shares as equity or debt for franchise tax purposes. The court cited *Fin Hay*'s discussion of the distinction between debt and equity and the relevant factors bearing on the inquiry. *Arch*, 958 S.W.2d at 477 n.3.

court was authorized to consider debt as equity or capital for net worth supersedeas bond purposes if the evidence supported a determination that the parties treated the transaction or investment as capital or equity rather than as debt or a liability. A court is not bound to the parties' characterization of the interests involved and has discretion to accept or reject some or all of Appellants' balance sheet figures in light of all surrounding circumstances.

Turning to their legal sufficiency challenge, Appellants contend the $20 million note is a liability as a matter of law and no controverting evidence supports the trial court's contrary finding. We must decide if Appellants have shown that the evidence conclusively establishes, as a matter of law, all vital facts in support of their contention that they met their burden of proof to show net worth. *Id*. at *7; *Ramco*, 171 S.W.3d at 910. We conclude they have not made the necessary showing.

Considered in the light most favorable to the trial court's findings, the evidence shows, among other things: that the transaction was a related-party transaction benefitting Beeman and other Beeman family members (who themselves controlled HeartBrand as shareholders and managers and directors and officers); that Ronald Beeman offered the associated line of credit to HeartBrand on more generous terms than banks offered; that the note had no maturity date until August 2018; that the principal balance increased from under $1,000,000 to well over $20,000,000 within a matter of years; that though HeartBrand paid interest, it paid minimal principal and no plan existed to pay the principal balance when the note matured in 2028; and that the interest rate was modified repeatedly and never exceeded 4%. Twinwood's evidence, which the trial court accepted, revealed a substantive relationship between Ronald Beeman and the company his family controlled that was much different than that which would accompany an arm's length loan with a third party disinterested financial institution. As more than one witness said, a bank

17

likely would not have agreed to the same terms and, in fact, the bank Ronald Beeman approached for an initial loan refused. We hold the above evidence is legally sufficient to support the court's finding that the $20 million note is properly considered as invested capital rather than as a liability. Appellants' review of the evidence disregards the standard of review and the deference we afford the trial court.[6]

Next, having considered the evidence both in favor of and contrary to the trial court's findings, Appellants have not demonstrated an abuse of discretion. As in *Texas Black Iron*, the trial court was presented with conflicting testimony, including expert evidence, and chose what to accept and what to reject. *Texas Black Iron*, 2020 WL 10231117, at *8. Testimony from interested witnesses may establish a fact as a matter of law only if the testimony could be readily contradicted if untrue, and is clear, direct, and positive, and there are no circumstances tending to discredit or impeach it. *See Lofton*, 777 S.W.2d at 386. Appellants' evidence was subject to several circumstances discrediting or impeaching it, including internal inconsistencies. To be sure, Appellants' expert testified that the note was properly treated as a liability under generally accepted accounting principles. But the court was not required to credit that testimony, and it did not. Even though the trial court declined to disregard the testimony of Appellants' witnesses entirely, the court reasonably could have chosen not to believe certain portions of their testimony. The court's finding is not against the great weight and preponderance of the evidence.

---

[6] This is not to say that the trial court's factual statements are completely accurate. For instance, although the signed order describes a four-year span in which the debt grew from $780,000 to $24,000,000 and during which time HeartBrand made no principal payments, the court incorrectly implies that no principal payments were ever made. The evidence indicates that HeartBrand made some principal payments in 2014 and 2015, at least. Even so, the underlying findings having support in the evidence are sufficient to uphold the characterization of the promissory note as invested capital rather than a debt.

18

We conclude the evidence is legally and factually sufficient to support the trial court's findings that the $20 million promissory note is properly considered as invested capital rather than a debt.

### 3.    *The dividend payments and share purchases*

The jury returned its verdict on July 16, 2021. The court found that the $875,000 shareholder buyback occurred on July 28, 2021, and the $1.5 million dividend distribution occurred in September 2021. The court further found that those amounts should be added back into HeartBrand's net worth calculation because they represented an effort to reduce net worth after an adverse jury verdict and, but for those distributions and purchases, "there would be additional assets on the HeartBrand balance sheet."

Appellants contend that the court's findings are error because HeartBrand no longer has access to that money[7] and, moreover, the only permissible ground on which to disregard those transactions is if they were proven by Twinwood to be fraudulent transfers. Regarding the first point, while we agree that those funds are no longer available to HeartBrand—and disregarding the transactions for net worth purposes will not afford it access to an additional $2,375,000 in cash—HeartBrand has not argued that it otherwise lacks the liquidity or assets necessary to secure a supersedeas bond in the amount the trial court ordered, nor has it claimed that requiring it to file such a bond will cause it substantial economic harm.

---

[7] As Appellants assert, "[t]he amount HeartBrand distributed as a dividend and the amount it spent on share purchases are not HeartBrand's assets." Appellants cite *Texas Custom Pools*, in which the court held that the trial court abused its discretion by "adding back in to the net worth calculation the sums paid to the shareholders" which were "obviously not reflected in the [] balance sheet." *Texas Custom Pools*, 293 S.W.3d at 310.

19

Moreover, the trial court is not constrained only to fraudulent transfer law in determining how to account for a post-verdict asset transfer. As Twinwood observes, courts are empowered to enjoin the dissipation of assets to avoid satisfaction of judgments, *see* Tex. R. App. P. 24.2(d), and have discretion to disregard post-verdict transactions such as these if the court finds they were made outside the ordinary course of business in an effort to reduce one's net worth. *See LMC Complete Auto.*, 229 S.W.3d at 486 (concluding evidence supported court finding that depreciation allowance on balance sheet was not made in ordinary course of business but inserted post-verdict to reduce net worth; acknowledging that judgment debtor's transactions with majority shareholder could be used to increase a net worth calculation, though finding insufficient evidence to do so on facts presented). We agree that, under the present circumstances, disregarding these post-verdict transactions was within the trial court's authority so long as the findings are supported by evidence.

We first examine HeartBrand's $1.5 million dividend distribution. The trial court's findings were based on a variety of evidence, which showed among other things that: (1) the decision to pay dividends was made after the jury's adverse verdict; (2) there was no regular practice of paying dividends to HeartBrand shareholders, and in fact the $1.5 million was only the second time the company had paid dividends;[8] (3) most of the payments went to Ronald Beeman's family; and (4) HeartBrand's external accountant was unaware of the payments but would have expected to be made aware of them if they occurred. We note that the trial court disregarded only the 2021 dividends, not the 2020 dividends. We hold the evidence is legally sufficient to support the trial court's finding that the dividend payments

---

[8] HeartBrand had not paid dividends in the fourteen years preceding 2020.

were outside the ordinary course of business and represented an effort to reduce net worth after an adverse verdict.

We next examine the entire record, considering all the evidence. Appellants highlight several facts which they contend support reversal. They note that: (1) substantial dividends went to forty-one non-Beeman-family shareholders who hold almost 30% of HeartBrand stock; (2) that HeartBrand had a profitable year (albeit one significantly marred by the adverse jury verdict); (3) that the only other occasion when HeartBrand paid dividends (in 2020) likewise followed a profitable year; and (4) that HeartBrand retained substantial cash even after the dividend payments were made. We conclude, however, that these facts fail to demonstrate the trial court abused its discretion or that the court's findings are against the great weight and preponderance of the evidence. Although the dividend payments may have followed a profitable year, they also followed an adverse jury verdict of over $20 million. The trial court disregarded only the 2021 dividends, not the 2020 dividends.

The post-verdict share purchases are a different matter. The share purchases were initiated by three early investors unrelated to the Beeman family who requested their money back. One of them needed the funds for medical expenses. None of the shares were owned by people who had any connection with the underlying allegations of wrongdoing. We see no evidence that HeartBrand or Ronald Beeman prompted these share purchases; all indications point to the shareholders themselves asking to cash out their shares, and HeartBrand merely acquiescing to their requests. Also, as HeartBrand stock was neither widely-owned nor publicly-traded—it had roughly forty to sixty shareholders at any given time—its shares would not tend to be readily marketable. Given the lack of a liquid market for the shares of such a corporation, it is unsurprising that HeartBrand would be a willing purchaser under

21

the circumstances. *Cf. Ritchie v. Rupe*, 339 S.W.3d 275, 293 n.33 (Tex. App.—Dallas 2011), *rev'd on other grounds*, 443 S.W.3d 856 (Tex. 2014) ("Often the parties most interested in acquiring the minority shareholder's interest in a closely held corporation are the corporation itself or its other shareholders"); Frank H. Easterbrook & Daniel R. Fischel, *Close Corporations and Agency Costs*, 38 Stan. L. Rev. 271, 274 (1986) (observing that "investors in closely held corporations lack a public market for claims" like "shares or equity").[9] Though we are not suggesting that stock repurchases by close or closely held corporations are beyond suspicion, nothing except the timing of these purchases suggests wrongdoing, and HeartBrand did not initiate their timing.

The present circumstances do not support the trial court's finding that the share purchases were outside the ordinary course of business or made in an effort to reduce net worth. We conclude the trial court abused its discretion by adding the value of the share purchases to increase HeartBrand's net worth.

**D.    Twinwood's motion**

In its rule 24 motion, Twinwood first argues that the bond amount must be increased to $20,454,863 as the default amount under rule 24.2(a)(1) without application of the net worth cap because HeartBrand failed to carry its burden of proof to establish net worth. *See Ruff v. Ruff*, No. 05-18-00326-CV, 2018 WL 2926639, at *4 (Tex. App.—Dallas June 8, 2018, mem. op. on motion), *op. after reinstatement of appeal*, 2020 WL 4592794 (Tex. App.—Dallas Aug. 11, 2020, pet. denied) (affirming the trial court's dismissal of insufficient and incomplete net worth evidence as lacking in credibility); *Bishop Abbey Homes, Ltd. v. Hale*, No. 05-14-01137-CV, 2015 WL 4456209, at *4, *6 (Tex. App.—Dallas July 21, 2015, mem.

---

[9] We express no opinion whether HeartBrand qualifies as a closely held corporation under Texas law. *See* Tex. Bus. Orgs. Code Ann. § 21.563(a)(1).

op. on motion) (affirming the trial court's holding the judgment debtor failed to meet his burden where the balance sheet contained "numerous errors" and was therefore unreliable). In the cases Twinwood cites, however, the courts found the totality of the judgment debtors' net worth evidence so utterly lacking in credibility, reliability, or substance, that it constituted no evidence. Other courts have reached similar results when trial courts are unable to determine a specific net worth based on the evidence. *See Texas Black Iron*, 2020 WL 10231117, at *8 (collecting cases). Here, in contrast, Appellants presented some evidence, and the trial court, exercising its discretion to accept part and reject part, was able to determine, and did determine, a sum certain as HeartBrand's net worth.

In its second argument, Twinwood urges us to apply a "fair value" approach to asset valuation, rather than a "book value" approach and accept the trial court's alternate finding that "based on the available evidence of fair value of assets, . . . HeartBrand's net worth is no less than $65,471,804." The court's alternative calculation assesses the value of certain assets—such as the herd, semen straws, and meat—at their current market values. Twinwood contends that valuing those assets at their "fair" market amounts is an acceptable practice under International Financial Reporting Standards, as well as GAAP, and that it is appropriate and necessary to consider that value in determining net worth. But the trial court's fair value calculations were merely conditional findings, and we need not address them. Twinwood has not shown that the court abused its discretion in calculating HeartBrand's net worth based on evidence of the company's book value. *Cf. EnviroPower*, 265 S.W.3d at 6 (holding that when the book value of assets was not disputed, the trial court abused its discretion in setting a supersedeas bond amount that disregarded the book value). As the *EnviroPower* court explained, trial courts are not to determine the value of a judgment debtor's assets upon their sale and then

23

use that value, thus determined, to set the bond. *Id.* Such an approach thwarts the Legislature's approach in amending Civil Practice and Remedies Code section 52.006. *Id.*

## Conclusion

We grant Appellants' motion with respect to the trial court's erroneous addition of $875,000 representative of the share purchases to increase HeartBrand's net worth, and we deny the motion in all other respects. We deny Twinwood's motion. We order that HeartBrand's net worth is $34,916,168. HeartBrand is required to file security in half that amount, which is $17,458,084. Tex. R. App. P. 24.2(a)(1). Because HeartBrand has filed a bond in the amount of $6,708,183.90, HeartBrand must file additional security of $10,749,900.10 in order to continue superseding the judgment. We lift our February 16, 2022 stay order. Because our order requires HeartBrand to file additional security in the trial court, enforcement of the judgment is suspended for twenty days from today's date. Tex. R. App. P. 24.4(e).


/s/ Kevin Jewell
Justice


Panel Consists of Justices Jewell, Zimmerer, and Hassan.

24